Robert B. Sykes (#3180)
C. Peter Sorensen (#16728)
Christina D. Isom (#17244)
**SYKES MCALLISTER LAW OFFICES, PLLC**
311 S. State Street, Suite 240
Salt Lake City, Utah 84111
Telephone No. (801) 533-0222
bob@sykesmcallisterlaw.com
pete@sykesmcallisterlaw.com
christina@sykesmcallisterlaw.com
*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT

## DISTRICT OF UTAH

| | |
|---|---|
| ATONIO SIVATIA, through his Guardian & Mother Nonnie L. Masaniai Pea, and NONNIE L. MASANIAI PEA,<br><br>   Plaintiffs,<br><br>   vs.<br><br>AMMON FOX, JAMES WILLIAMS, NICK GREEN, and CHAD FAUBION, West Valley City Police Officers; DOE DEPUTIES 1-10; and WEST VALLEY CITY, by and through its Police Department,<br><br>   Defendants. | **COMPLAINT**<br>**AND**<br>**JURY DEMAND**<br><br><br>Civil No. _____<br><br><br>Judge _____ |

Plaintiffs Atonio Sivatia, through his Guardian and Mother Nonnie L. Masaniai Pea, and Nonnie L. Masaniai Pea through counsel of record, complain against Defendants as follows:

## <u>PRELIMINARY STATEMENT</u>

The following allegations are based upon the undersigned's understanding of the information presently available. This is a civil rights action in which the Plaintiffs

seek relief for Defendants' violation of their rights guaranteed by the United States Constitution, specifically the Fourth and Fourteenth Amendments. These rights are further secured by the Civil Rights Act of 1871, codified as 42 U.S.C. § 1983 and § 1988. This action also seeks relief under the law, statutes and Constitution of the State of Utah, specifically Article I, §§ 7, 9 and 14.

## JURISDICTION AND VENUE

1.      This action arises under the United States Constitution and federal law, particularly under the provisions of the Fourth and Fourteenth Amendments to the Constitution of the United States, and 42 U.S.C. §§ 1983 and 1988.

2.      This action also arises under the Constitution of the State of Utah Article I, §§ 7, 9 and 14.

3.      This action seeks redress for violations of the civil rights laws of the United States, and jurisdiction is therefore invoked pursuant to 28 U.S.C. §1343 and 42 U.S.C. §1983.

4.      As to the State Constitutional claims, this Court's supplemental jurisdiction is invoked under 28 U.S.C. §1367.

5.      The claims made in this Complaint occurred and arose in the State of Utah, in this District. Venue for the federal claims is therefore proper under 28 U.S.C. §§ 1391 and 1331. Venue for the State claims is proper under 28 U.S.C. §1367.

6.      Plaintiffs are seeking damages pursuant to the claims for relief specified below in amounts to be proved at trial.

7.      This Court has authority to award costs and attorney fees pursuant to 42 U.S.C. §1988, and pursuant to the Court's inherent power under State law.

8.      This action also seeks redress for violations of Plaintiffs' constitutional rights secured by the Utah Constitution. This Court further has pendent jurisdiction over any and all State claims.

## PARTIES

9.      Plaintiff **Atonio Sivatia** ("Atonio") is a resident of Riverton, Salt Lake County, Utah.

10.      Plaintiff **Nonnie L. Masaniai Pea** ("Nonnie") is a resident of Woods Cross, Davis County, Utah. Nonnie is Atonio's mother and has been legally appointed by the Court to act as Atonio's Guardian and Conservator.

11.      Defendant **Ammon Fox** ("Fox") was at all relevant times herein an officer with the West Valley City Police Department, a department of West Valley City, operating in the course and scope of his employment, and under the color and guise of the laws of the State of Utah.

12.      Defendant **Chad Faubion** ("Faubion") was at all relevant times herein an officer with the West Valley City Police Department, a department of West Valley City, operating in the course and scope of his employment, and under the color and guise of the laws of the State of Utah.

13.      Defendant **James Williams** ("Williams") was at all relevant times herein an officer with the West Valley City Police Department, a department of West

3

Valley City, operating in the course and scope of his employment, and under the color and guise of the laws of the State of Utah.

14.     Defendant **Nick Green** ("Green") was at all relevant times herein an officer with the West Valley City Police Department, a department of West Valley City, operating in the course and scope of his employment, and under the color and guise of the laws of the State of Utah.

15.     Defendants **Doe Officers 1-10** were at all relevant times herein officers of the West Valley City Police Department, a department of West Valley City, operating in the course and scope of their employment, and under the color and guise of the laws of the State of Utah. The specific identities are presently unknown, but upon positive identification they will be properly served with process, and their individual names will be added to this Complaint in accordance with the applicable federal rules.

16.     Defendant **West Valley City** is a political subdivision of the State of Utah. West Valley City has a law enforcement branch known as the West Valley City Police Department ("WVCPD") which is authorized to operate by West Valley City and the State of Utah. West Valley City funds and supervises the WVCPD and is legally responsible for the acts of its employee officers that are within the course and scope of their employment. West Valley City, through the actions of WVCPD Officers Fox, Faubion, Williams, Green, and Does 1-10, is a "person" within the meaning of 42 U.S.C. § 1983. Officers Fox, Faubion, Williams, Green, and Does 1-10 were at all times state actors.

## **FACTUAL ALLEGATIONS**

17.     The incident in question occurred early in the morning of December 6, 2020. Some of the background facts occurred late in the evening of December 5, 2020.

18.     Early in the morning of December 6, 2020, WVCPD received a call from an apartment complex at approximately 4000 South and Redwood Road ("Complex"). The caller reported an individual was causing a commotion in the parking lot.

19.     Fox responded to the call and arrived at the Complex to find an individual yelling and screaming.

20.     The individual yelling and screaming was Atonio Sivatia.

21.     Atonio had broken a window at the apartment complex.

22.     When Atonio saw Fox, he began to walk away, toward where the parking lot exited onto Redwood Road.

23.     Fox began to chase after him.

24.     Atonio began to cross Redwood Road.

25.     Just after midnight, Fox fired his taser and struck Atonio in the back.

26.     Atonio immediately dropped to the road on his back, arms outward, in the inside southbound lane of Redwood Road, with his head pointed north, so he could not see oncoming traffic.

27.     Atonio said "I'm sorry" to Fox for walking away.

28.     Fox never warned Atonio before tasing him.

5

29. Once Atonio was on the road, Fox ordered him to stay where he was.

30. Atonio complied with the orders from Fox to stay in the traffic lane (on his back, head to the north).

31. Atonio was unarmed.

32. Atonio made no threats to Fox or any other person.

33. Atonio had initially walked away and disobeyed orders by Fox, but had taken no hostile or threatening actions as he walked, and had made no threats.

34. Atonio presented no risk of harm or serious injury to Fox, any other officer, or to any citizen.

35. At the point that Atonio was on his back in the inside lane of traffic on Redwood Road, he had ceased any effort to walk away.

36. At that point, any potential threat Atonio posed was completely subdued and abated.

37. Fox ordered Atonio to stay where he was in the southbound inside lane of traffic, on his back with his head to the north.

38. Atonio obeyed Fox.

39. The way Fox forced him to lay in the road with his head to the north in the inside southbound lane, prevented Atonio from seeing on-coming traffic coming toward him.

40. Atonio was at all times completely compliant and remained on the road following Fox's directions.

**41.**     Fox knew cars were driving on the dark road just after midnight and knew that Atonio could potentially be struck.

**42.**     Fox knew that on-coming motorists would be unable to see Atonio lying flat on the road in the dark.

**43.**     Any reasonable Officer would have known with certainty that compelling a suspect, like Atonio, to lie on his back in a lane of highspeed traffic on Redwood Road at midnight would subject that suspect to a very high risk of catastrophic injury from being struck by a motorist who would not expect to encounter a person lying on the road at that time of night.

**44.**     Tasing causes the tased individual to lose all muscle control and fall in the spot where he is tased, and remain immobile for 30-60 seconds.

**45.**     The WVCPD policy manual and department training prohibit tasing of someone at a location where the tased person would be at risk for harm from traffic or other causes.

**46.**     Any objectively reasonable officer would have known not to tase a subject at a location where it would put the subject at risk or extreme risk of harm such as the risk of being struck by a vehicle.

**47.**     Tasing is viewed by WVCPD policy and Tenth Circuit law as the use of extreme force.

**48.**     Tasing is only permitted under WVCPD policy and training where the suspect is a severe threat to himself or others.

**49.** Tasing is prohibited under WVCPD policy for minor offenses.

**50.** Prior to Fox's tasing of Atonio, Atonio had committed only very minor offenses, and may have committed no offenses at all.

**51.** Fox knew that tasing Atonio under the circumstances violated WVCPD policy as well as his police training but chose to tase Atonio anyway.

**52.** Fox's actions were more than just negligent but were reckless, grossly negligent and extremely outrageous under the circumstances.

**53.** Just after Atonio was tased and had dropped to the ground, one car barely missed striking Atonio but swerved at the last minute into the number two southbound lane around Atonio.

**54.** Fox acted recklessly in several aspects, but he was particularly reckless when he continued to order Atonio to stay on the road and not move even though he could see that traffic was not blocked and was moving toward Atonio.

**55.** The roadway was dark, and not well lit.

**56.** Redwood Road is a major thoroughfare that accommodates heavy traffic at all hours.

**57.** It was the early morning hours, just past midnight, and drivers could not easily see Atonio on the roadway.

**58.** Atonio was complying with Fox's orders to stay on the ground and was calm while talking to Fox.

59.     Fox never allowed Atonio to get up and move off the dark roadway to safety.

60.     Atonio was detained but was never told he was under arrest.

61.     Fox knew that cars were driving on the dark roadway at high speeds.

62.     Fox knew that keeping Atonio on his back in the roadway put Atonio's life and safety in grave danger.

63.     After the tasing, Fox ordered Atonio to remain where he was in Lane1 of the southbound traffic for many seconds before Atonio was struck by a vehicle.

64.     Fox could have easily, at any time, directed Atonio to move onto the shoulder of the road.

65.     Fox was aware of the grave danger because he could see multiple vehicles coming toward the point where Atonio lay, some of them barely missing Atonio.

66.     Shortly after Fox tased Atonio, Officer Williams arrived at the scene and parked a short distance to the south of Fox, while Atonio lay the middle turning lane.

67.     Williams' emergency lights were on.

68.     Williams' headlights were on, pointing northward, such as to create a blinding effect on traffic headed south in Lane 1.

69.     From his vehicle Williams could see Fox, as well as Atonio on the ground talking to Fox.

70.     Williams observed that Atonio was being fully compliant with Fox's demands.

**71.**     Williams did not feel the need to rush because Atonio was obviously compliant with Fox's commands.

**72.**     Atonio was not handcuffed.

**73.**     Williams got out of his vehicle and approached Atonio to handcuff him.

**74.**     Williams stopped to put on his gloves.

**75.**     Williams could and did perceive the risk of grave danger that Atonio could be hit by a vehicle and be seriously injured or killed, but ignored the risk and did nothing.

**76.**     Williams had an obligation to intervene to prevent harm and civil rights violations to Atonio, but he failed to take any action to protect Atonio from harm that was very predictable.

**77.**     Williams had many seconds during which he could have easily intervened to prevent injury to Atonio.

**78.**     At this critical moment, Williams and Fox were 12-15 feet away from Atonio to the south. The two officers were discussing next steps in the arrest of Atonio.

**79.**     Neither Fox or Williams had placed a vehicle in the southbound number 1 lane to block traffic from approaching and possibly hitting Atonio while he was laying supine, head forward, complying with Fox's directions to stay on the ground.

80.     WVCPD policy and training required Fox and Williams to place a blocking vehicle to protect someone like Atonio from being hit. They should have done this.

81.     The officers took no precaution whatsoever to block southbound traffic from hitting Atonio.

82.     While Fox was waiting, Williams began walking toward Atonio. At that moment, a white sedan, traveling southbound in the number 1 lane, came toward Atonio and the officers at a high rate of speed.

83.     The driver of the vehicle did not see Atonio and hit him.

84.     The undercarriage of the vehicle caught Atonio and dragged him approximately 15 feet toward Fox.

85.     When the vehicle hit Atonio it only stopped because it became stuck on top of Atonio after dragging him.

86.     Fox saw the incident and began running toward the white vehicle trying to get it to stop, but it was too late.

87.     Fox was also struck by the front bumper of the white sedan as it came to a stop on top of Atonio. Fox was knocked to the ground but was not seriously injured.

88.     It is unclear when Faubion and Green arrived on scene.

89.     If Faubion and Green were present at the scene when the white sedan hit Atonio, and had the ability to prevent the incident, they are liable for failure to take steps to protect Atonio from violations of his rights, as alleged herein.

90.     When the white sedan finally came to a stop, Atonio was still pinned under the car after being dragged.

91.     Atonio's legs were pointing southbound, and the car's front axle was resting on his head and chest.

92.     Once the white sedan was stopped, Williams rushed to the driver's door and pounded on the window ordering the driver to exit the car.

93.     Williams opened the door and pulled the driver from the car.

94.     As soon as the driver's seat was open, Faubion jumped into the car and drove in reverse in an attempt to get the car off Atonio's head and torso.

95.     Fox and Green pushed on the front bumper as Faubion reversed in order to get the car off of Atonio.

96.     The Officers were able to back the car off of Atonio.

97.     Once Atonio was out from under the vehicle, Faubion and Green traded off performing CPR on Atonio.

98.     The driver of the vehicle indicated she was a nurse, and also helped perform CPR until emergency medical support arrived.

99.     The driver of the white sedan had been drinking and had blood drawn for testing.

100.    The driver was not cited for DUI on the scene.

101.    It was foreseeable to Defendant Officers that leaving Atonio in the middle of the dark, busy roadway could result in him being hit by a car and injured.

102.    Officers never placed a blocking vehicle in the southbound lanes to alert drivers of Atonio laying, by police command, in the middle of the road.

103.    Atonio has suffered extreme life altering injuries as a result of the Officers' recklessness in leaving him lying in the roadway, forbidding him from moving, and not blocking the lane of traffic.

104.    Atonio has undergone multiple surgeries since being hit by the car and will likely have to have many follow-up surgeries in the years to come.

105.    Atonio is no longer able to walk.

106.    Atonio is no longer able to talk.

107.    Atonio can no longer move his arms normally.

108.    Atonio can no longer move his body normally.

109.    Atonio can no longer bathe himself or care for his personal hygiene.

110.    Atonio can no longer prepare food for himself.

111.    Atonio can no longer hear well.

112.    Atonio can no longer carry on a conversation.

113.    Atonio is unable to concentrate or focus on what is happening around him.

114.    Atonio does not remember where he is or what day of the week it is.

115.    Atonio is not able to discern when he is having an emergency.

116.    Atonio no longer has the physical or mental ability to care for himself in any capacity.

**117.** Over the past twelve months, Atonio has been determined to have sustained a very serious traumatic brain injury (TBI).

**118.** Atonio is severely functionally limited as a result of the reckless actions of Officers Fox, Williams, and Does 1-10.

**119.** Because of the consequences of the Officers' recklessness and unconstitutional use of force as set forth above, Atonio has been rendered permanently and totally disabled. Among other things, Atonio can no longer:

   **a.** Perform any of his own ADL (activities of daily living);

   **b.** Receive and evaluate information;

   **c.** Make and communicate decisions;

   **d.** Work in any capacity; and

   **e.** Provide for necessities such as food, shelter, clothing, healthcare, or safety requirements.

**120.** Nonnie L. Masaniai Pea ("Nonnie") is Atonio's mother and has been appointed by the Court as his Guardian and Conservator.

**121.** Nonnie has lost the relationship and society of her only son.

**122.** Atonio was very close to his mother and three older sisters. He can no longer have a relationship with them because of the recklessness of the Defendants on December 6, 2020.

**123.** Nonnie has suffered the loss of relationship and companionship of her only son.

## FIRST CAUSE OF ACTION

### ~ *Excessive Force* ~

**Violation of the Fourth and Fourteenth Amendment**
**Against Fox in his Individual and Representative Capacities**

**Cognizable Under 42 U.S.C. § 1983**

**124.** We incorporate all other paragraphs herein.

**125.** The Supreme Court has outlined three factors to evaluate reasonableness of force under the Fourth Amendment: (1) the *severity of the crime* at issue; (2) whether the suspect poses an *immediate threat* to the safety of the officers or others; and (3) whether the suspect is actively *resisting arrest or attempting to evade* arrest by flight at the precise moment that force is used. *Graham v. Connor,* 490 U.S. 386 (1989).

**126.** The proper focus in determining the reasonableness of force used is on the events immediately confronting an officer when he or she decided to use force.

**127.** Force is not reasonable when a suspect is non-violent, not resisting, not fleeing, or poses no threat. Force is not permitted at all when there is no need to use force.

**128.** Taser use "unquestionably 'seizes' the victim in an abrupt and violent manner." *Cavanaugh v. Woods Cross City,* 625 F.3d 661, 665 (10th Cir. 2010). The nature and quality of "the intrusion into the interest[]" of a citizen who is tased is "quite severe." *Id.*

**129.**     A police officer violates the Fourth Amendment if he uses a "[t]aser against a non-violent misdemeanant who appeared to pose no threat and who was given no warning or chance to comply with the officer's demands." *Cavanaugh*, 625 F.3d at 666.

**130.**     Although use of a taser is certainly preferable to deadly force, it is still a harsh method to subdue a person. A taser, by design, delivers an intense shock that causes great pain and is intended to disable the suspect. *Finlinson v. Millard County,* 2018 WL 5438436, *16 (D. Utah 2018).

**131.**     Officer Fox's use of a taser against Atonio was unreasonable and excessive.

**132.**     Atonio had committed no serious crime.

**133.**     At the time Fox followed and tased Atonio, he had at most, 1) walked away from the scene of an argument; 2) possibly broke a window; and/or 3) not stopped when Officer Fox told him to do so. These are all minor misdemeanors under Utah law.

**134.**     Fox recklessly, deliberately, and needlessly chased Atonio onto a busy, dark highway for no substantial reason.

**135.**     Fox needlessly escalated the encounter.

**136.**     By escalating the encounter, Fox created, in his own subjective thinking, a justification for his ultimate use of unconstitutional force.

**137.**     Fox knew he could easily obtain Atonio's name and address from witnesses at the party and arrest him later without putting anyone at risk from high speed traffic on Redwood Road.

**138.**    Atonio had done nothing serious enough to require an immediate arrest. Among other things:

      **a.**    Atonio's "crime[s]" were minor at most;

      **b.**    Atonio had no weapon;

      **c.**    Atonio had made no threats to citizens or officers;

      **d.**    there was no immediate or imminent threat of harm to any citizen or officer if Atonio was not immediately apprehended; and

      **e.**    Atonio's "escape" was not permanent but was temporary at best.

**139.**    Fox never warned Atonio he was going to be tased if he did not comply with his commands.

**140.**    At the precise moment Fox used force and deployed his taser, Atonio was, at most, a non-complying misdemeanant.

**141.**    Atonio never made verbal or physical threats, toward any Officers at any time.

**142.**    Prior to Fox's use of force, no one on the scene had alleged Atonio was in possession of a weapon of any kind.

**143.**    At the precise moment Fox used force, Atonio possessed no weapon.

**144.**    Fox's subjective views of the encounter are irrelevant in the analysis of whether or not his use of force was reasonable.

145.     What is important is how an "objectively reasonable" officer would have addressed the situation.

146.     Fox's use of force was not objectively reasonable.

147.     Fox violated Atonio's federal constitutional rights to be free from excessive force.

148.     An objectively reasonable officer on the scene would have known that tasing a person in the back, without warning, in the middle of a dark, busy highway, constituted a serious, outrageous, and unnecessary use of force.

149.     It is clearly established and well known to all reasonably trained, police officers that an individual's constitutional rights are violated by the unreasonable use of a taser in the manner in which it was deployed in this case.

150.     In December 2020, every reasonable police officer in Utah would have been familiar with the law set forth in *Uhlrig v. Harder*, 64 F.3d 567 (10th Cir. 1995) with regard to a state-created danger. *Uhlrig* indicated that "[t]he classic case of state actors creating a danger so as to give rise to §1983 liability is *Wood v. Ostrander*, where police officers placed plaintiff in danger by impounding her car and abandoning her in a high crime area at 2:30 a.m., thereby distinguishing Wood from the general public and triggering a duty of the police to afford her some measure of peace and safety." *Uhlrig*, 64 F.3d at 572 (cleaned up; citing *Wood*, 879 F.2d 583, 589-90 (9th Cir. 1989), *cert. den.,* 498 U.S. 938 (1990)). Fox would have known that he could not leave a detainee in a dangerous or a precarious situation that would deprive him of his rights under the Fourth Amendment.

**151.**     In December 2020, every reasonable police officer in Utah would have been aware of the 10th Circuit case of *Lee v. Tucker*, 904 F.3d 1045 (10th Cir. 2018). In *Lee*, sheriff's deputies used a stun gun (taser) on Lee's back for an alleged misdemeanor domestic violence crime that involved arguing, intoxication, and Lee shoving his wife. *Id.* at 1147-48. The court held that "the law was clearly established that an officer may not use a Taser against a non-violent misdemeanant who appeared to pose no threat and who was given no warning or chance to comply with the officer's demands." *Id.* at 1150 (cleaned up and punctuation omitted). Fox would have known in December 2020 that he could not use a taser on Atonio because he was, at most, a non-violent misdemeanant who posed no threat.

**152.**     In December 2020, all reasonable police officers in Utah would have been aware of the 10th Circuit decision in *Emmett v. Armstrong*, 973 F.3d 1127 (10th Cir. 2020). Emmett had been drinking in a bar in a small Wyoming town, got in a fight, and then initially ran from Officer Armstrong. Officer Fox and the other Defendants would have known that Atonio could not be tased unless "the officers [or others] were in danger at the precise moment that they used force." *Emmett*, 973 F.3d. at 1136 (citing *Pauly v. White*, 874 F.3d 1197, 1219 (10th Cir. 2017)).

**153.**     Officer Fox, acting under color of statute, regulation, custom, and/or usage subjected Atonio to unnecessary, unreasonable, and excessive force, by unlawfully tasing him in the back without warning.

**154.**     Fox is not entitled to qualified immunity based on his unlawful and illegal use of excessive force.

**155.**     Officer Fox's use of unreasonable and excessive force on Atonio directly and proximately caused his injuries and damages set forth herein.

**156.**     The conduct of Fox and Williams warrants the imposition of punitive damages as may be allowed by law.

## SECOND CAUSE OF ACTION

### *~ State Constitutional Claims ~*

*Violation of the Utah Constitution*
*Against Officers Fox and Williams in Their Individual Capacities*

**Cognizable Under Article 1, Sections 7, 9, and 14 of the Utah Constitution**

**157.**     We incorporate all other paragraphs herein.

**158.**     Article I of the Utah Constitution provides protection of basic rights for Utah citizens, as follows:

    **a.**     Against illegal seizure – Section 7
    **b.**     Against excessive force and unnecessary rigor – Section 9
    **c.**     Against denial of due process – Section 14

**159.**     Fox flagrantly violated Atonio's Utah Constitutional rights when he illegally seized him.

**160.**     Fox flagrantly violated Atonio's Utah Constitutional rights when he used excessive force in unreasonably tasing him in the back, without warning.

**161.**    Fox and Williams flagrantly violated Atonio's Utah Constitutional rights by denying him due process.

**162.**    The Utah Constitution Article I, Section 9 states:

Persons arrested or imprisoned shall not be treated with unnecessary rigor.

**163.**    Fox and Williams flagrantly violated Atonio's Utah Constitutional right to be free from unnecessary rigor.

**164.**    The Utah Supreme Court has clarified the "unnecessary rigor" clause of Article 1 §9 of the Utah Constitution as follows:

The unnecessary rigor clause of the Utah Constitution protects persons arrested or imprisoned from the imposition of circumstances on them during their confinement that ***demand more of the prisoner than society is entitled to require. The restriction on unnecessary rigor is focused on the circumstances and nature of the process and conditions of confinement***.

*Dexter v. Bosko,* 2008 UT 29, ¶17, 184 P.3d 592 (emphasis added). The Court clarified: "This may include ***being unnecessarily exposed to an increased risk of serious harm***." *Id.* at ¶19 (emphasis added).

**165.**    Atonio was unnecessarily exposed to an increased risk of serious harm when he was tased on a heavily traveled road and ordered to remain there, where he could not see oncoming traffic, and where no blocking vehicle protected him.

**166.**    He was not only exposed to that risk, but he suffered directly from it, resulting in catastrophic, life changing permanent injuries.

**167.**    The Utah Supreme Court has held:

> We have held that the last sentence [of Article I, Section 9] makes section 9 **broader than its federal counterpart**. *See Bishop I,* 717 P.2d at 267. Article I, section 9 is also a self-executing provision that prohibits specific evils that can be remedied without implementing legislation.

*State v. Lafferty,* 2001 UT 19, ¶73, 20 P.3d 342, 365 (emphasis and bracketed text added).

168.    Fox was keenly aware that Atonio was detained in the middle of a dark, busy roadway and that traffic was not blocked in the lane in which Atonio was laying.

169.    Fox witnessed one car narrowly miss hitting Atonio, but the car swerved around him a the last second.

170.    This narrow miss put Fox on further notice of the very real danger Atonio was facing.

171.    Fox and Williams knew traffic was not blocked and they could both see cars on the roadway heading toward Atonio, but still took no steps to block the lane of traffic north of Atonio to protect him from oncoming traffic.

172.    Pursuant to the unnecessary rigor clause of Article I, § 9 of the Utah Constitution, Defendants had a duty to ensure that Atonio was not unnecessarily exposed to an increased risk of serious harm.

173.    Defendants breached this duty by knowingly and intentionally leaving Atonio laying in the lane of oncoming traffic on a dark, busy roadway without blocking the lane, and by ordering him to stay there.

174.    Defendants have long been aware that there are specific well-established protocols in West Valley City which are used to detain individuals safely.

**175.**    Defendants knowingly and willfully did not follow the established protocols to detain individuals safely.

**176.**    Because Defendants did not follow protocol in safely detaining Atonio, they unnecessarily exposed him to a significantly higher risk of injury and accordingly "demand[ed] more of the prisoner than society is entitled to require." *Dexter,* at ¶17 (brackets added).

**177.**    Defendants' conduct exposed a detained Atonio to grave harm on a dark, busy highway, thus subjecting him to unnecessary rigor.

**178.**    Any reasonable official in the position of each Defendant would have understood that not blocking the oncoming traffic, or having the compliant Atonio follow them to the sidewalk, would expose him to an increased risk of harm, which occurred in this case.

**179.**    The Utah Supreme Court has held:

> In contrast, to recover monetary damages for a violation of the Utah Constitution, a plaintiff must demonstrate that the provision violated by the defendant is self-executing and then must establish three elements: (1) the plaintiff "suffered a flagrant violation of his or her constitutional rights;" (2) "existing remedies do not redress his or her injuries;" and (3) "equitable relief, such as an injunction, was and is wholly inadequate to protect the plaintiff's rights or redress his or her injuries."

*Jensen ex rel. Jensen v. Cunningham,* 2011 UT 17, ¶48, 250 P.3d 465 (citing *Spackman ex rel. Spackman v. Bd. Of Educ.,* 2000 UT 87, ¶¶18,23-25, 16 P.3d 533).

**180.**    Atonio Sivatia suffered a flagrant violation of his rights under the Utah Constitution, Article I, § 9, when Defendants knowingly and willfully violated

protocol requiring them to safely detain Atonio, and instead left him lying in the middle of a dark roadway where oncoming traffic was coming, and failed to block traffic. The correct protocol would have necessitated Atonio being moved from the roadway and/or blocking the lane of traffic with a police vehicle.

181.    Defendants had no reasonable justification for leaving Atonio laying in the middle of a busy, dark roadway at midnight without blocking traffic.

182.    There is no equitable relief that would adequately redress Atonio's loss, nor are there existing remedies that would redress Nonnie's loss since Atonio's injuries.

183.    As a direct and proximate result of Defendant's recklessness in leaving Atonio in the middle of a dark, busy roadway without blocking traffic, Atonio was hit by a car and has suffered catastrophic mental and physical injuries which have changed his life forever.

184.    The Utah Constitution, Article I, Section 7 states:

> No person shall be deprived of life, liberty, or property without due process of law.

185.    Atonio suffered a flagrant violation of his constitutional right not to be deprived of his life without due process when Defendants knowingly and willfully left him in the middle of a dark, busy roadway at night without blocking oncoming traffic.

186.    Defendants' recklessness in not blocking the lane of traffic or moving Atonio to the side of the road, resulted in catastrophic, life altering injuries.

187.    As a direct and proximate result of Defendants' flagrant violation, Atonio was run over by a car, resulting in catastrophic, life changing injuries.

188.    No other remedy for Atonio's illegal seizure and unconstitutional injuries exist.

189.    The conduct of Fox, Williams and the Doe Officers 1-10 warrants the imposition of damages and punitive damages as may be allowed by law and as alleged herein.

### THIRD CAUSE OF ACTION

### *~ Unlawful or Deficient, Policies, Procedures and/or Protocols ~*

**Against West Valley City through its Police Department Relating to Defective Policies, Customs or Practices**

**Cognizable Under 42 U.S.C. §1983**

190.    Plaintiff incorporates by reference all other allegations herein.

191.    The West Valley City Police Department (WVCPD) is an authorized department or division of West Valley City. West Valley City is therefore responsible for the actions of WVCPD Officers.

192.    After the tasing, Officers Fox, and Williams wrongfully, and unreasonably left Atonio laying in the middle of a dark, busy highway at night.

193.    This resulted in Atonio being run over by a car wherein he sustained profound catastrophic life altering injuries resulting in permanent, total disability as well as a deprivation of his constitutional rights and loss of liberty.

194.     At all relevant times herein, West Valley City was the employer, operator, and/or administrator of the WVCPD.

195.     West Valley City, through WVCPD, had a duty to create, adopt, and promulgate, implement, enforce, revise, and/or update lawful policies, procedures, and/or protocols on the legal and safe tasing and detention of individuals.

196.     West Valley City, through WVCPD, knowingly and recklessly failed to create, adopt, promulgate, implement, enforce, revise, and/or update lawful policies, procedures, and/or protocols regarding tasing, arrest, excessive force, and detention, specifically about when such tactics and procedures are permitted by law and how they were to be conducted.

197.     West Valley City, through WVCPD, failed to create, adopt, promulgate, implement, enforce, revise and/or update lawful policies, procedures and/or protocols ("policies") pertaining to tasing and the safe detention of individuals.

198.     The failure to have and utilize such policies proximately caused Officers to tase Atonio in the back, without warning, at a dangerous location under dangerous circumstances.

199.     West Valley City's failures as described above, caused Defendants to leave Atonio laying in the southbound number 1 lane of traffic on a busy, dark roadway, resulting in catastrophic injuries and loss of constitutional rights.

**200.**     The above-described actions, or inactions of West Valley City, through the WVCPD, constitute willful and wanton misconduct and heedless disregard to the rights, health, well-being, and safety of Utah citizens, particularly Atonio. Such heedless disregard warrants the imposition of punitive damages.

**201.**     Plaintiffs have been damaged as set forth herein.

**202.**     Plaintiffs demand judgment against West Valley City for compensatory damages, for punitive damages, for costs and attorney fees, and for such other relief as this Court deems just and proper, and as may be allowed by law.

### FOURTH CAUSE OF ACTION

### ~ *Failure to Train and/or Supervise* ~

### *Against West Valley City through the WVCPD in their Official Capacity*

### Cognizable Under 42 U.S.C. § 1983

**203.**     Plaintiffs incorporate by reference all other allegations herein.

**204.**     The action of Officers Fox and Williams toward Atonio were pursuant to, and consistent with, established policies, practices, and/or customs of Defendant West Valley City, through the WVCPD, for which West Valley City is responsible.

**205.**     WVCPD had a practice, policy, or custom of arming police officers with tasers and condoning their use without requiring warning, and without providing proper training and/or supervision regarding their safe, reasonable, and appropriate use in situations like the one Fox faced here.

**206.** The actions of Officers Fox, Williams, and Doe Officers 1-10 show a lack of training in safely detaining individuals.

**207.** The lack of proper training and supervision caused Officer Fox and other Defendants to unreasonably and improperly tase Atonio and use unreasonable and excessive force to detain him, directly resulting in catastrophic injuries and other damages described herein.

**208.** The failure of West Valley City, through WVPD, to properly train and supervise Officers Fox and Williams resulted in their reckless tasing of Atonio and leaving him in the middle of a busy dark roadway where he was run over by a car.

**209.** Had there been proper training Atonio never would have been tased on a busy roadway, and Williams or some other Officer would have blocked the southbound number 1 lane of traffic where Atonio was laying.

**210.** The failure to train and supervise Fox and Williams caused their reckless conduct which resulted in catastrophic injuries to Atonio.

**211.** Defendant West Valley City, through WVCPD, was deliberately indifferent toward the proper training, arming, and supervision of its police officers.

**212.** The actions of West Valley City, through its WVCPD, were the proximate cause of Plaintiffs' injuries and damages, including Atonio's catastrophic, life altering injuries and damages, as well as his pain and suffering.

**213.** As a result of WVCPD's actions, and in order to remedy this important issue of public concern, Plaintiffs have had to retain legal counsel.

## FIFTH CAUSE OF ACTION

### ~ *State Created Danger* ~

### *Against all Defendants*

214.    Plaintiffs incorporate by reference all other paragraphs herein.

215.    "Generally, state actors are liable only for their own acts, and not the violent acts of third parties." *Armijo by and through Chavez v. Wagon Mound Public Schools,* 159 F.3d 1253, 1260 (10th Cir. 1998) (quoting *Liebson v. New Mexico Corrections Dep't,* 73 F.3d 274, 276 (10th Cir. 1996)). However, there are two exceptions to this general rule:

> The first exception, known as the ***special relationship doctrine***, "exists when the state assumes control over an individual sufficient to trigger an affirmative duty to provide protection to that individual." The second exception, sometimes referred to as the ***"danger creation" theory***, provides that the state may also be liable for an individual's safety "if it created the danger that harmed the individual."

*Armijo,* 159 F.3d at 1260 (emphasis added) (quoting *Uhlrig v. Harder,* 64 F.3d 567, 572 (10th Cir. 1995) and *DeShaney v. Winnebago Co. Dep't of Social Servs.,* 489 U.S. 189, 199-200 (1989)).

216.    Utah Courts, as a matter of public policy, have said that "governmental actors should be answerable in tort when their negligent conduct causes injury to persons who stand so far apart from the general public that we can describe them as having a special relationship to the governmental actor." *Francis v. State Division of Wildlife Resources,* 2013 UT 65, ¶31, 321 P.3d 1029.

217.    In *Francis,* the Utah Supreme Court recognized four instances where a special relationship would arise:

> (1) by statute intended to protect a specific class of persons of which the plaintiff is a member from a particular type of harm; (2) when a government agent undertakes specific action to protect a person or property; *(3) by governmental actions that reasonably induce detrimental reliance by a member of the public; and (4) under certain circumstances, when the agency has actual custody of the plaintiff or of a third person who causes harm to the plaintiff*.

*Francis,* at ¶27 (emphasis added).

218.    Here, Defendant Officers undertook specific actions to induce detrimental reliance by Atonio that he would not be run over by a car while being detained in the middle of the dark roadway.

219.    Additionally, the Defendants had actual custody of Atonio at the time he was run over because he had complied with commands to stay down in the middle of the road.

220.    Defendants are responsible for the safety of pretrial detainees.

221.    Defendants had a duty to Atonio to keep him safe from unreasonable, *foreseeable* harm that can be caused by leaving him lying in the middle of a dark, road.

222.    Defendants failed to take even rudimentary steps to make Atonio safe such as getting him out of the lane of traffic or blocking the lane of traffic in which he was lying.

223.    Defendants' conduct was egregious and outrageous.

**224.**     Defendants' conduct evidenced extreme carelessness and recklessness in needlessly exposing Atonio to such a dangerous condition, with obvious serious and/or potentially fatal consequences.

**225.**     As a direct and proximate cause of Defendants' breach of their duties of care, Atonio has suffered catastrophic and permanent life altering injuries and damages.

**226.**     These consequences and damages will continue for the rest of Atonio's life. This includes life-long medical care, more surgeries, life-long assisted living care, and life-long loss of meaningful relationships with family and friends.

**227.**     Atonio's life has been irreparably damaged. He is never going to be the same.

**228.**     The cost of Atonio's life-long assisted living and care will exceed $20,000,000.

**229.**     There is no medical cure for the massive brain injury sustained by Atonio.

**230.**     Defendants are responsible for Plaintiffs' injuries and damages set forth herein.

## SIXTH CAUSE OF ACTION

### ~ *Loss of Consortium* ~

### *Against all Defendants*

**231.**     Plaintiffs incorporate by reference all other paragraphs herein.

**232.**     This loss of consortium claim is not subject to notice under the Utah Governmental Immunity Act, including the requirement to file a notice of claim because it is a derivative claim. This claim is derived from federal and state constitutional actions on which no notice of claim and no application of the Utah Governmental Immunity Act are required. Plaintiffs have nevertheless filed notice of this claim in this case.

**233.**     The wrongdoing of Defendants caused injury to Atonio, which has caused Nonnie to be denied consortium, companionship, love, and emotional support that she formally enjoyed with Atonio.

**234.**     Nonnie's damages were caused by the wrongful, unconstitutional acts alleged in the First, Second, Third, Fourth, and Fifth Causes of Action herein, and are therefore caused by Defendants' unconstitutional conduct.

**235.**     Nonnie is entitled to damages for the loss of consortium as determined by a jury, and for punitive damages and attorney fees as may be allowed by law.

## SUMMARY OF INJURIES AND DAMAGES

**236.**     Plaintiffs incorporate by reference all other paragraphs herein.

**237.**     Atonio was illegally seized by Fox.

**238.** Atonio was struck by a car due to the actions of Defendants, and suffered catastrophic injuries including but not limited to extremely serious brain injury, profound loss of almost all brain and bodily functions, massive and permanent orthopedic injuries, inability to take care of any of his ADL (activities of daily living), and other major life altering damages.

**239.** Atonio will now have to live in a care facility for the rest of his life. He will require twenty-four (24) hour care and supervision.

**240.** Atonio's family members have been denied the association and benefit of his company and life.

**241.** Atonio was subjected to unnecessary rigor while being detained unsafely in the middle of the dark, busy roadway.

**242.** Because of Defendants' unnecessary and unreasonable actions, Atonio has suffered severe life altering damage including: great physical pain, mental and emotional damage, loss of familial relationship, and economic damage in the millions of dollars.

**243.** These damages are caused by the actions of Defendants, specifically Officers Fox and Williams, as well as by West Valley City, which employs Defendant Officers.

## **JURY DEMANDED**

Plaintiffs demand a Jury Trial on all Causes of Action included herein.

## REQUESTS FOR RELIEF

**WHEREFORE,** Plaintiffs pray judgment against Defendants as follows:

1.      For general and compensatory damages in an amount to be determined at trial;

2.      For special damages as are shown at trial and as may be allowed by law;

3.      For punitive damages against Defendants as may be allowed by law and as are shown at trial;

4.      For pre-judgment interest on the damages assessed by the Court, as allowed by law;

5.      For Plaintiffs' costs and reasonable attorney fees incurred herein, pursuant to 42 U.S.C. 1988; and as otherwise may be allowed by Utah State or federal law; and,

6.      For such other and further relief as the Court deems just and proper.

DATED this 28th day of December 2021.

**SYKES McALLISTER LAW OFFICES, PLLC**

*/s/ C. Peter Sorensen*
ROBERT B. SYKES
C. PETER SORENSEN
CHRISTINA D. ISOM
*Attorneys for Plaintiffs*