Mitchell A. Stephens (11775)
Justin L. James (15167)
JAMES DODGE RUSSELL & STEPHENS, P.C.
10 West Broadway, Suite 400
Salt Lake City, Utah 84101
Telephone: 801.363.6363
Email: mstephens@jdrslaw.com
         jjames@jdrslaw.com

*Attorneys for Plaintiffs*

---

## UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH

| | |
|---|---|
| ATONIO SIVATIA, through his Guardian Nonnie L. Masaniai Pea, and NONNIE L. MASANIAI PEA, <br><br> Plaintiffs, <br><br> vs. <br><br> AMMON FOX, JAMES WILLIAMS, NICK GREEN, and CHAD FAUBION; DOE DEPUTIES 1-10; and WEST VALLEY CITY, <br><br> Defendants. | **OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT** <br><br> Civil No. 2:21-cv-00761-DBB <br><br> Judge David Barlow |

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, Plaintiffs Atonio Sivatia and Nonnie L. Masaniai Pea (collectively, "Sivatia"), submit this Opposition to the Motion for Partial Summary Judgment (the "Motion") filed by Defendants Ammon Fox ("Fox"), James Williams ("Williams"), Nick Green ("Green"), Chad Faubion ("Faubion") and West Valley City ("West Valley") (collectively, "Defendants"). [*See* Motion (Dkt. 48)].

## INTRODUCTION

The following image shows Sivatia lying in the fast lane of Highway SR-68 after Ammon Fox ("Fox") shot Sivatia with his Taser and repeatedly yelled "don't move or I will hit you again."



[*See* Officer Fox's Body Worn Camera Footage ("Fox Video") (Mot. at Ex. 3) at ~1:41].

It does not take specialized training to predict what happened when Defendants forced Sivatia to lie down on the highway. Children are taught not to play in the road. And yet Defendants, brandishing the power of the government, forced Sivatia to remain defenseless, prostrate, in the dark, on the highway, with his head facing oncoming traffic. When Sivatia rolled toward the comparative safety of the median (and onto his back), Sivatia was threatened: "Do not move or I will hit you again." [*Id.* at ~2:14].

Sivatia cried and apologized. He had no weapons. He had not injured anyone. Sivatia was having a psychiatric episode and experiencing suicidal thoughts. Defendants now claim they

1

were protecting Sivatia.  But their "protection" caused Sivatia's head to become wedged under a Mazda.

Rather than protect Sivatia from oncoming traffic, James Williams ("Williams") parked his police SUV in the median and **behind** Sivatia, with his flashing police lights blinding oncoming traffic.  In so doing, he rejected standard protocol.  [*See, e.g.*, WVC Manual (Mot. at Ex. 7) § 501.2 ("position the patrol vehicle in the affected lane(s) of traffic"); *id.* at § 501.3(e) ("Police vehicles should be used to block traffic lanes . . . .")].  The following depicts Williams' SUV, and the distance Sivatia's body was dragged by oncoming traffic:



[SLCPD Collision Reconstruction Report ("SLC Report") (Ex. A) at WVC0091].  Neither Fox nor Williams instructed or allowed Sivatia to move to the median or behind the parked SUV.  Sivatia was forced to remain lying down in traffic.

What happened next is hardly a surprise, which makes the images and videos even more haunting.  They show exact moment a person became permanently disabled:



[*See* Fox Video (Mot. at Ex. 3) at ~3:08].

No Court should accept Defendants' arguments that this case represents proper police conduct intended "***to protect Sivatia***."  [Motion (Dkt. 48) at 2 (emphasis added)].  Justice means refusing to accept that Sivatia's tragedy "just is."

## SIVATIA'S STATEMENT OF FACTS

Sivatia does not contend that the following facts are undisputed.  Nor does he need to.

"The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *accord Mick v. Brewer*, 76 F.3d 1127, 1136-37 (10th Cir. 1996) (reversing grant of summary judgment on qualified immunity because of "a dispute of material fact").

## I.      The Incident.

1.      On December 6, 2020, shortly after midnight, West Valley "officers were responding to a call for service in the area of 4000 s Redwood Road." [Deputy Report (Mot. at Ex. 2) at Sivatia_0119]. The police radio announced the call as "psychiatric." [WVC0047 (police radio) (Ex. B) at 00:01].

2.      Defendants were advised that Sivatia was a "Mental Subject" who had shouted "kill me." [Deputy Report (Mot. at Ex. 2) at Sivatia_0121; *accord id.* at Sivatia_0123 ("yelling suicidal comments before leaving")]. Sivatia "was running door to door at the redwood apartments, yelling/threatening to run into the road to kill himself." [WVFD Report (Ex. C) at Sivatia_04457; *accord* Faubion Interview (Mot. at Ex. 6) at Sivatia_3348 ("[H]e's got something going on. He obviously needs help.")]. Sivatia was not armed.

3.      It was not clear to the officers whether "we could just kinda . . . stand there and let this guy play it out while we, you know, get there, or if it needed to be lights and sirens." [Faubion Interview (Mot. at Ex. 6) at Sivatia_3337].

4.      As Fox approached, Sivatia moved toward the highway. [*See* Fox Video (Mot. at Ex. 3) at ~1:04 ("He's not moving too vast.")].

5.      Fox shot Sivatia with his Taser "in the middle of" the highway. [Deputy Report (Mot. at Ex. 2) at Sivatia_0128]. "[H]e's, like, in the middle of the road." [Williams Interview

(Mot. at Ex. 5) at Sivtia_3357; Fox Video (Mot. at Ex. 3) at ~1:56 ("[W]e're in the middle of Redwood Road")].

6.      Fox justified using the Taser by claiming Sivatia "attempted to intentionally get hit by a car."  [Fox Video (Mot. at Ex. 3) at ~2:09; Deputy Report (Mot. at Ex. 2) at Sivatia_0127 ("suspected of being suicidal and attempting to be struck by a vehicle"); *id.* at Sivatia_0128 ("Fox advised over the radio that [Sivatia] was attempting to be hit by vehicles in the road . . . .")].

7.      However, Sivatia ran across the highway.  Indeed, he almost made it to median before Fox Tasered him.



[*Id.* at ~1:36].

8.      As Sivatia regained consciousness, Fox repeatedly ordered him lie down, head first, in oncoming traffic.  [*See id.* at ~1:42 ("Don't move"); *id.* at ~1:49 ("Don't move or I will hit you again"); *id.* at ~2:29 ("You keep your hands right where they're at . . . ."); *id.* at ~2:47 ("Don't you move")].  When Sivatia rolled onto his back – and towards the median – officer Fox was clear:

"Do not move or I will hit you again."  [*Id.* at ~2:14].

9.      Sivatia began crying and apologizing.  [*See id.* at ~1:52 ("I'm sorry"); *id.* at ~3:05 (crying)].  Sivatia "was complying with . . . Sergeant Fox."  [Williams Interview (Mot. at Ex. 5) at Sivatia_3356; *id.* at Sivatia_3360 ("Yeah, he was compliant."); *id.* at Sivatia_3367 ("[H]e was being compliant.")].

10.     As ordered, Sivatia was lying "supine and like on his back" on the dark Highway. [*Id.* at Sivatia_3357].  Indeed, even Williams "didn't even see [Sivatia] on the ground at first." [*Id.* at Sivatia_3360].

11.     Williams ultimately saw that Fox had his Taser "prongs into the suspect."  [*Id.* at Sivatia_3355].  "The suspect was like, he was supine laying on the ground in the [fast] lane."  [*Id.*].

12.     However, Williams did ***not*** block oncoming traffic with his SUV.  Instead, he "parked [his] car facing [oncoming traffic] in the middle lane."  [*Id.*].  In so doing, he rejected standard protocols and common sense.  [*See, e.g.*, WVC Manual (Mot. at Ex. 7) § 501.1 ("position the patrol vehicle in the affected lane(s) of traffic"); *id.* at § 501.3(e) ("Police vehicles should be used to block traffic lanes . . . ."); *see also* WVC Manual Excerpts (Ex. D) at § 502.3.1(c) ("position their vehicle . . . to create a safety buffer")].  He also distracted oncoming traffic from the actual concern – Sivatia's body – by parking over and away from Sivatia and by having his headlights and police lights activated in that irrelevant area.  [*See* Motion (Dkt. 48) at Statement 13 ("Williams parked his vehicle in the 'suicide lane' with his flashing lights on.")].

13.     The following image depicts the relevant area and distances.  Williams's SUV is the blue vehicle.  The white vehicle arrived after Sivatia was hit.  [*See* Fox Video (Mot. at Ex. 3) at ~5:19 (incoming cruiser)].



[SLC Report (Ex. A) at WVC0062; *see also* Offense Report Excerpt (Ex. E) at Sivatia_3332 (colliding vehicle passenger indicating "officers should have had a patrol car blocking traffic in the [south] bound lanes")].

14. Williams "didn't think [he] needed to rush or anything like that." [Williams Interview (Mot. at Ex. 5) at Sivatia_3356]. That said, Williams also understood the danger of standing in middle of the highway. Accordingly, he did not linger in the fast lane. For example, he "went back to the middle lane kind of like in line with [his] car" to "put[] on [his] gloves." [*Id.*; *see also* Fox Video (Mot. at Ex. 3) at ~2:57 ("You got gloves?")].

15. Defendants had not blocked traffic. Nor had Defendants moved Sivatia to a safe location. As a result, an automobile traveling on the highway hit Sivatia as he was lying defenseless on the ground:



[*See* Fox Video (Mot. at Ex. 3) at ~3:08].

16. Because Sivatia was lying on the road, this was not a typical traffic accident. The Mazda was traveling at only 21 miles per hour. [*See* SLC Report (Ex. A) at WVC_0092]. Expert

testimony, which has not yet begun, will show that the threat of any automobile accident would have been substantially diminished if Sivatia was not lying down – head first – in oncoming traffic. Even assuming no change in speed, the impact would have been absorbed by Sivatia's legs and the automobile's crumple zone.  His head never would have high-centered the vehicle's primary drive axle, like it did here.

17.     Under the conditions Defendants created, neither the driver nor passenger saw Sivatia lying on the dark road.  "[The] only reason that, like, [the car] stopped is because, like, the wheels kinda got, like, stuck on the body."  [Williams Interview (Mot. at Ex. 5) at Sivatia_3356; *accord id.* at Sivatia_3366 ("[H]e was . . . under the vehicle enough to where like the, the axle was kinda raised a little bit" and "the tires weren't connecting to the road.")].

18.     Defendants allowed the driver of the vehicle to perform emergency aid.



[Williams Video (Mot. at Ex. 4) at ~4:13; *accord* Faubion Interview (Mot. at Ex. 6) at Sivatia_3336; 3351-52].

19.     Minutes later, however, Defendants stopped performing CPR or other emergency aid.  Instead, they stood and discussed things amongst themselves:



[Fox Video (Mot. at Ex. 3) at ~13:57].

20.    In fact, Defendants discussed their lack of aid:  "Is he breathing?  Yeah, he's active breathing . . . ."   [*Id.* at ~14:20; *see also* Williams Video (Mot. at Ex. 4) at ~6:45 ("He's breathing"); *id.* at ~6:52 ("He's breathing, dude"); *id.* at ~6:59 ("He's still with us right now.")].  Yet Defendants stopped providing medical care to Sivatia.  They literally left him for dead.  [*See id.*; *see also* Williams Video (Mot. at Ex. 4)].  Then they billed him.  [*See* WVFD Billing (Ex. F) at Sivatia_04460].

21.    The following is the known timeline for Sivatia's medical needs:

- Approximately 12:00AM, Sivatia is tased.  [Fox Video (Mot. at Ex. 3) at ~1:40 ("00:00:10")].

- Approximately 12:02AM, Sivatia is run over.  [*Id.* at ~3:08 (00:01:39)].

- Approximately 12:03AM, the same drunk driver that ran Sivatia over is provides medical assistance to Sivatia.  [*See* Williams Video (Mot. at Ex. 4) at ~3:20 ("00:03:43")].

- Approximately 12:10AM, nobody is providing Sivatia with medical care because Defendants assume he will die.  [*See id.* at ~11:56].

- Approximately 12:13AM, Defendants discuss that Sivatia is still breathing but write him off for dead.  [*See* Fox Video (Mot. at Ex. 3) at ~14:16 ("00:12:46") ("Is he breathing? Yea, he's active breathing . . . .")].

- Approximately 2:30AM – ***two hours later*** – Sivatia arrives at the hospital.  [*See* Hospital Intake (Ex. G) ("Est. Dt of Arrival: 12/06/2020 02:30")].

22. Sivatia did not die.  However, his life will never be the same because of Defendants' conduct.  Sivatia requires twenty-four-hour care and is mostly confined to a wheelchair or bed.  He can speak and understand simple sentences, smile, and laugh.  He enjoys candy bars and Mountain Dew.  But he will never work, marry, or even make his own lunch.  [*See, e.g.*, Assessment (Ex. L)].

**II.    West Valley's Supervisory and Discovery Failures.**

23. West Valley has failed to produce responsive information and documents.

24. Sivatia served written discovery requesting, among other things, "[a]ll documents and/or communications referring or relating to the Incident."  [*See* Disc. Requests (Ex. H) at RFP 2].  Similarly, Sivatia requested "all reports relating to the Incident (including any *Garrity* Statements)," "internal investigations," and "third-party investigations, summaries, commentaries relating to the Incident."  [*Id.* at RFP 10].

25. The Incident Report confirms that Fox, Williams, Faubion, and Green all were interviewed after Sivatia was run over:

```
        Upon arrival, we were provided a brief of what had occurred.  I was
tasked by Det. Johanson to respond to the WVCPD station to assist the OICI
Protocol Investigators that were interviewing Sgt. Fox and Officers Faubion,
Green,  and J. Williams.

        The interviews were conducted in two interview rooms in the
Investigations Bureau area.  Upon completion of the interviews, I downloaded the
audio/video of the interviews onto a thumb drive provided by SLCPD Det. J.
Robison and provided them to him after the completion of the file transfer.
....

 I was advised Sgt. Fox was bruised but otherwise uninjured.  Sgt. Fox and the
three witness officers were transported to Division for interviewing.  Protocol
was initiated and SLC PD. Det. Weldon Wilson was assigned as the case lead
(20-219010).  Det. Dave Knaub was assigned lead for the crash investigation
(20-217825).
```

[*See* Deputy Report (Mot. at Ex. 2) at Sivatia_0127-28 (emphasis added)].

26.     "All officer interviews were audio and video recorded."  [*See* Offense Report

Excerpt (Ex. E) at Sivatia_3333].  Moreover, they were available West Valley.  [*See, e.g.*, *id.*

("Those recordings along with recordings from other interviews . . . were provide[d] to me by

WVCPD Detectives.")].

27.     However, Defendants have not produced audio, video, or written transcripts from

those interviews.  Nor have Defendants produced any reports, communications, or summaries

concerning those interviews.  [*See* Declaration of Jordan Pate ("Pate Dec.") (Ex. I) ¶ 4].

28.     Defendants have not produced an incident report or statement prepared by either

Fox or Williams.  [*See* Deputy Report (Mot. at Ex. 2)].

29.     Defendants have not produced a Taser report.  [*See id.*; *see also* WVC Manual (Mot.

at Ex. 7) § 304.6.1 (addressing Taser "reporting" including items that "shall be included")].

30.     Defendants have not produced a download of the Taser's onboard memory.  [*See*

Pate Dec. (Ex. I) ¶ 5; *accord* WVC Manual (Mot. at Ex. 7) § 304.8 ("The device's onboard

memory should be downloaded . . . and saved with the related arrest/crime report.")].

31.     Neither Fox nor Williams have been punished for their failures at the scene or thereafter.  [*See* Disc. Requests (Ex. H) at RFP 10 (seeking "reprimands"); Pate Dec. (Ex. I) ¶ 6 (none concerning Sivatia)].

## RESPONSE TO DEFENDANTS' STATEMENTS

**Statement No. 2:** The calls reported that an individual, later identified as Antonio Sivatia, was behaving violently and appeared to be having a mental health crisis. Witnesses reported the following: [subparagraphs follow].

**Response:** *Disputed.  Immaterial.*

Defendants' conduct cannot be analyzed post-mortem.   "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."  *Graham v. Connor*, 490 U.S. 386, 396 (1989). Defendants cannot now rely on alleged witness reports that were not known to them at the time they forced Sivatia to lie down in traffic.  *See, e.g.*, *Olsen v. Layton Hills Mall*, 312 F.3d 1304, 1313 (10th Cir. 2002) (reversing summary judgment because of factual dispute concerning "when the arrest took place—before or after [officer] spoke to the store clerk" supporting arrest).  "[U]sing this perspective limits the need for decision-makers to sort through conflicting versions of the 'actual' facts, and allows them to focus instead on what the police officer reasonably perceived." *Rowland v. Perry*, 41 F.3d 167, 173 (4th Cir. 1994); *accord Pauly v. White*, 874 F.3d 1197, 1207-08 (10th Cir. 2017) (looking "at the precise moment that [officer] used force").  An officer cannot act first and investigate second.

Importantly, Defendants' Statement No. 2 does not connect any of the alleged witness statements to the Defendants.  Statement No. 2 does not include a timeline.  There is zero evidence that Defendants knew about the alleged statements before they permanently disabled Sivatia.

Given the context in which the alleged statements are used, the only support for Defendants' Statement No. 2 is inadmissible hearsay. Defendants have not established that they were aware of the alleged witness statement before they forced Sivatia to lie down in traffic. Accordingly, they cannot contend that the alleged witness statements are being offered to explain their understanding of the facts. *See Graham*, 490 U.S. at 396. Instead, the alleged witness statements are being presented as the facts – i.e., "to prove the truth of the matter asserted." *See* Fed. R. Evid. 801(c)(2). Yet, Defendants have not included any declarations or other testimony from the alleged witness. *See* Fed. R. Civ. P. 56(c)(2) (recognizing facts must "be presented in a form that would be admissible in evidence").

> **Statement No. 2a:** Sivatia shouted, "Kill me!" and then punched a witness's car window until it broke.

**Response: *Disputed. Immaterial.***

The only citation for Statement No. 2a is the report of Officer Christiansen. However, Officer Christiansen did not arrive on the scene until ***after*** Sivatia had been crushed by oncoming traffic. [*See* Fox Video (Mot. at Ex. 3) at ~5:19 (incoming cruiser); *id.* at ~6:06 (exiting cruiser)]. Similarly, it was not until ***after*** Sivatia had been run over that Fox (briefly) interacted with driver of the Ford Focus. [*See id.* at ~5:37 (first interaction with Ford driver)]. Fox then asked Officer Christiansen to interview that driver. [*See id.*].

Moreover, the car window was ***not*** broken, as Officer Christiansen's own body camera footage confirms. [*See* Christiansen Stills (Ex. J)]. There is no evidence of a broken car window in the record. This dispute is material to Defendants' Motion and precludes summary judgment. Defendants cite to Utah Code § 76-6-301 (Robbery), which requires "force or fear of immediate force." Utah Code § 76-6-301(2)(b). [*See* Motion (Dkt. 48) at 8]. Punching a car window until it

shatters could support a finding Sivatia had used "force or fear of immediate force." *Id.* **But that did not happen.** [*See, e.g.*, Christensen Stills (Ex. J)].

    *See also* Response to Statement No. 2.

    **Statement No. 2b:** Sivatia began striking the windows of other cars in the apartment complex's parking lot.

    **Response:** *Disputed. Immaterial.*

    The only support for Statement No. 2b is the report of Officer Christiansen. However, Officer Christiansen did not arrive on the scene until *after* Sivatia had been crushed by oncoming traffic. [*See* Fox Video (Mot. at Ex. 3) at ~5:19 (incoming cruiser); *id.* at ~6:06 (exiting cruiser)]. Further, his report was based on an interview with a driver that had not been identified until *after* Sivatia had been run over. [*See id.* at ~5:37 (first interaction with Ford driver)]. Fox did not interact with the alleged driver/witness. [*See id.*]. Defendants' Motion does not include any witness statements that support Statement No. 2b. [*See* Motion (Dkt. 48) at Statement No. 2b]. It relies on Christiansen's after-the-fact hearsay recounting of what someone else allegedly observed.

    *See also* Response to Statement No. 2.

    **Statement No. 2c:** Sivatia attempted to enter the car of someone parked in the parking lot waiting for a friend, but the doors were locked. When he could not get in, Sivatia began banging his hand on the car's window while shouting, "Give me your fucking car." The car's driver quickly drove away out of fear.

    **Response:** *Disputed. Immaterial.*

    Again, the only citation for Statement No. 2c is the report of Officer Christiansen. However, Officer Christiansen did not arrive on the scene until *after* Sivatia had been crushed by oncoming traffic. [*See* Fox Video (Mot. at Ex. 3) at ~5:19 (incoming cruiser); *id.* at ~6:06 (exiting cruiser)]. Further, his report was based on an interview with a driver that had not been identified

until **after** Sivatia had been run over.  [*See id.* at ~5:37 (first interaction with Ford driver)].

Defendants' Motion does not include any witness statements that support Statement No. 2c.  [*See* Motion (Dkt. 48) at Statement No. 2c.  It relies on Christiansen's after-the-fact hearsay recounting of what someone else allegedly observed.

See also Response to Statement No. 2.

**Statement No. 2d:**  Sivatia banged on a witness's apartment door and then broke the apartment's window.

**Response:  *Disputed.  Immaterial.***

Again, the only citation for Statement No. 2d is the statement of Officer Christiansen.

However, Officer Christiansen did not arrive on the scene until **after** Sivatia had been crushed by oncoming traffic.  [*See* Fox Video (Mot. at Ex. 3) at ~5:19 (incoming cruiser); *id.* at ~6:06 (exiting cruiser)].   Defendants' MSJ does not include any witness statements that support Statement No. 2d.  [*See* Motion (Dkt. 48) at Statement No. 2d].

In addition, Defendants' Motion relies on the mistaken argument that "Officer Fox was discharged to the scene due to an attempted carjacking by Sivatia."  [*Id.* at 8].  Defendants do not argue, nor could they, that vandalizing a window or suicidal thoughts justified the use of deadly force and being smashed by a car.

**Statement No. 6:**  Officer Fox believed that Sivatia was attempting to get hit by cars driving on Redwood Road.

**Response:  *Partially Disputed.***

Defendants' Statement No. 6 directly refutes their primary argument.  Defendants' Motion argues that Fox tased Sivatia because he had committed "an inherently violent crime."  [*Id.* at 9].  Statement No. 6 declares the opposite.  Indeed, it confirms that Fox **did not** have evidence of an

alleged carjacking.   Instead, Fox tased Sivatia solely because he "believed that Sivatia was attempting to get hit by cars."  [*See id.* at Statement No. 6].  Standing alone, this fact prevents the Court from granting Defendants' Motion.

Moreover, it was not objectively reasonable for Fox to believe that he was protecting Sivatia from oncoming traffic by forcing him to lie down on the highway.  *See generally Reavis Estate of Coale v. Frost*, 967 F.3d 978, 985 (10th Cir. 2020) (analyzing "***the precise moment*** that they used force" (emphasis added)).  The following image shows the conditions at the time Fox deployed his Taser:



[Fox Video (Mot. at Ex. 3) at ~1:40].  As shown, Sivatia was crossing the street and had nearly reached the median when Fox deployed his Taser.  The break in traffic was enough for Sivatia and

Fox to safely cross the road.  But, it obviously was not safe to force Sivatia to remain prostrate and unprotected on the road.  It was objectively unreasonable to conclude otherwise.

**Statement No. 9:**  As Sivatia lay on the road, Officer Fox shined a blinking flashlight toward oncoming traffic.

**Response:  *Immaterial.  Partially Disputed.***

Initially, Fox's decision to Taser Sivatia in the middle of the highway was unreasonable. That misconduct was compounded when Sivatia was repeatedly ordered not to move despite obvious traffic on the highway.  Similarly, Statement No. 9 is remarkable for what is missing – any effort by Williams to protect Sivatia.  "Shortly after Officer Fox discharged his Taser, Officer Jason Williams arrived on the scene."  [Motion (Dkt. 48) at Statement No. 11].  And yet, the Motion does not describe ***any*** effort by Williams to protect Sivatia.  Indeed, Williams remarkably made things worse.  [*See id.* at Statement Nos. 10-15].  Sivatia's life never should have hinged on "a [single] blinking flashlight" inconsistently moving in the middle of the highway.  [*See, e.g.*, Williams Interview (Mot. at Ex. 5) at Sivatia_3360 (confirming Fox's actions were inadequate because Williams "didn't even see [Sivatia] on the ground at first")].

Moreover, a blinking flashlight alone is ***not*** an appropriate, or decipherable, traffic signal. "To stop traffic, the officer should first extend his arm and index finger toward and look directly at the person to be stopped until that person is aware . . . ."  [WVC Manual (Mot. at Ex. 7) § 501.3(g)(1)].  "The pointing hand is then raised at the wrist so that the palm is toward the person to be stopped . . . ."  [*Id.*].  It is the standard signal seen on an intersection light:



Defendants had the power to control traffic.  *See, e.g.*, Utah Code § 41-6a-209.  An officer's order to stop must be followed.  *Id.* at § 41-6a-210.  But merely blinking a flashlight is not that order.  [*See also* WVC Manual (Mot. at Ex. 7) § 501.3(g)(5) (recognizing use of flashlight in conjunction with "arm signals")].

Statement No. 9 also is partially disputed.  At times, Fox pointed "a blinking flashlight toward oncoming traffic."  But Fox also turned the flashlight (and his attention) away from Sivatia and traffic.  Indeed, Fox's own statements confirm that he ***did not*** address the obvious danger: "***Dude, I don't know where that car came from***."  [Fox Video (Mot. at Ex. 3) at ~7:48].

**Statement No. 14:**  Less than 15 seconds after Officer Williams arrived at the scene, but after Officer Williams exited his own vehicle, the civilian vehicle pulled away and drove around where Sivatia lay.

**Response:  *Disputed as Incomplete.***

Defendants' Motion relies on the alleged timing of Williams's arrival.  However, it ignores other material facts and inferences that must be drawn in Sivatia's favor.  "From the time of the tasing (00:00:09 hours) to the collision (00:01:39 hours), the time totaled 1 minute and 30 seconds."  [SLC Report (Ex. A) at WVC_0092].  But even 15 seconds would have been enough time for Williams to park in front of oncoming traffic.

Their own statements confirm that neither Fox nor Williams was directing or blocking traffic:

- "Dude, I don't know where that car came from."  [Fox Video (Mot. at Ex. 3) at ~7:48].

- "I don't fricken know where that car came from."  [*Id.* at ~9:57].

- "I don't know which car it was that was stopped in this lane . . . ."  [*Id.* at ~11:07].

- "Where the frick did it come from?"  [*Id.* at 11:17].

- "This is the car that was stopped?"  [*Id.* at 11:28].

## LEGAL STANDARDS

## I.  DEFENDANTS VIOLATED SIVATIA'S ESTABLISHED RIGHTS.

Defendants' Motion does not recognize the Defendants' multiple wrongful and calloused acts.  Instead, Defendants rely on disputed and incomplete facts.  Then they argue that "use of a Taser . . . did not violate Sivatia's constitutional rights."  [Motion (Dkt. 48) at 6].  That analysis and argument fails.

### A.    Legal Standards.

"Where, as here, the excessive force claim arises in the context of an arrest or investigatory stop of a free citizen, it is most properly characterized as one invoking the protections of the Fourth Amendment . . . ."  *Graham*, 490 U.S. at 394.  That analysis "requires a careful balancing of the nature and quality of the intrusion on the individual's . . . interests against the countervailing governmental interests at stake."  *Id.* at 396 (cleaned up).

"Because the test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application . . . its proper application requires careful attention to the facts and circumstances of each particular case . . . ."  *Id.*  The Supreme Court has set forth three non-

exclusive factors to consider: (1) "the severity of the crime at issue"; (2) "whether the suspect pose[d] an immediate threat to the safety of the officers or others"; and (3) "whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight." *Id.* However, the second factor is "undoubtedly the 'most important' and fact intensive factor in determining the objective reasonableness of an officer's use of force." *Reavis*, 967 F.3d at 985.

The Tenth Circuit has provided factors to "consider when evaluating the degree of a threat": (a) "whether the officers ordered the suspect to drop his weapon"; (b) "whether any hostile motions were made with the weapon"; (c) "the distance separating the officers and the suspect"; and (d) "the manifest intentions of the suspect." *Id.* "The reasonableness of the officer's actions depends both on whether the officers were in danger ***at the precise moment*** that they used force and on whether ***their own reckless or deliberate conduct*** during the seizure unreasonably created the need to use such force." *Id.* (emphasis added) (cleaned up).

These same standards apply to Defendants' use of the Taser. *See, e.g.*, *Cavanaugh v. Woods Cross City*, 625 F.3d 661, 665-66 (10th Cir. 2010) ("[T]he *Graham* factors do not justify [defendant's] use of his Taser."). Indeed, that law is established. *Coronado v. Olsen*, No. 2:18-CV-83, 2019 WL 652350, at *6 (D. Utah Feb. 15, 2019) ("[I]t was clearly established . . ., and the Defendant Officers should have known, that tasing a non-violent suspect who was not actively resisting arrest and was only guilty of failing to comply with orders constituted excessive force."). *See generally* https://www.reuters.com/investigates/special-report/usa-taser-database/ (examining 1,081 "deaths involving Tasers").

In addition, the Fourteenth Amendment protects against "deliberately wrongful government decisions." *See Uhlrig v. Harder*, 64 F.3d 567, 573 (10th Cir. 1995). "[W]hen the

21

State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being." *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 199-200 (1989).  "[W]hen the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs— *e.g.*, food, clothing, shelter, medical care, and reasonable safety—it transgresses the substantive limits on state action set by the Eighth Amendment and the Due Process Clause."  *Id.* at 200; *cf. City of Revere v. Massachusetts Gen. Hosp.*, 463 U.S. 239, 244-46 (1983) (duty to provide medical care to injured suspects in police custody); *Youngberg v. Romeo*, 457 U.S. 307, 324-35 (1982) (duty to protect committed mental patients from harm).  *See generally Sanders v. Bd. of Cnty. Comm'rs of Cnty. of Jefferson, Colorado*, 192 F. Supp. 2d 1094, 1123-24 (D. Colo. 2001) (finding no qualified immunity for Columbine shooting because law clearly defines "the contours of the special relationship doctrine").  "Behavior under this standard is 'viewed in total' – 'the cumulative impression of [the] conduct should be considered.'"  *Hunt v. Montano*, 39 F.4th 1270, 1281 (10th Cir. 2022) (reversing dismissal of § 1983 claim based on injuries suffered while in care of foster parent).

Finally, when the "facts and circumstances" are disputed, summary judgment is improper. "When things are in such a posture, courts are required to view the facts and draw reasonable inferences in the light most favorable to the party opposing the summary judgment motion." *Scott v. Harris*, 550 U.S. 372, 378 (2007) (cleaned up).  "In qualified immunity cases, this usually means adopting . . . the plaintiff's version of the facts."  *Id.*  "[A] contested issue of fact that is material

to the qualified immunity analysis gives rise to a jury question." *Maestas v. Lujan*, 351 F.3d 1001, 1008 (10th Cir. 2003).

   **B.      It was unreasonable to Tase Sivatia in the middle of the dark highway when he posed no immediate threat.**

Defendants do not appropriately analyze the decision to Taser Sivatia in the back, in the middle of the highway.  As recognized, use of force is analyzed for "objective reasonableness." *Reavis*, 967 F.3d at 985.  Among other factors, the Court must consider "the severity of the crime," whether a party is "actively resisting arrest or attempting to evade arrest by flight," "safety of the officers," "whether the officers ordered the suspect to drop his weapon," "whether any hostile motions were made with the weapon," "the distance separating the officers and the suspect," and "the manifest intentions of the suspect."  *Id.*  Moreover, "[t]he reasonableness of the officer's actions depends both on whether the officers were in danger *at the precise moment* that they used force . . . ."  *Id.* (emphasis added) (cleaned up).

This case does not present objectively reasonable police conduct.  Defendants have not established that Sivatia was a violent criminal.  Nor could they.  Defendants were called to help a citizen in psychological distress.  Sivatia "shouted 'Kill me!'" [Motion (Dkt. 48) at Statement 2a]. He had not verbally threatened anyone else.  Nor had he physically assaulted anyone.  He was not armed.  He never made any hostile motions toward Defendants.  He never approached Defendants. And, "at the precise moment" Fox tased him in the back, Sivatia was not near anyone.  *See id.* Defendants also never warned Sivatia about the use of the Taser.  [*See generally* Fox Video (Mot. at Ex. 3); *see also* WVC Manual (Mot. at Ex. 7) § 304.4 ("A verbal warning of the intended use of the [Taser] should precede its application . . . .")].  *Cf. Casey v. City of Fed. Heights*, 509 F.3d

1278, 1285 (10th Cir. 2007) ("[W]e think a reasonable jury could decide that [officer] was not entitled under these circumstances to shoot [a Taser] first and ask questions later.").

Defendants' police manual precludes the use of a Taser in these circumstances:

304.5.1   APPLICATION OF THE CONDUCTIVE ENERGY DEVICE
The Conducted Energy Device (CED) may be used in any of the following circumstances, when the circumstances perceived by the officer at the time indicate that such application is reasonably necessary to control a person:

    (a)   The subject is violent or is physically resisting.

    (b)   The subject has demonstrated, by words or action, an intention to be violent or to physically resist, and reasonably appears to present the potential to harm officers, him/herself or others.

Mere flight from a pursuing officer, without other known circumstances or factors, is not good cause for the use of the Conducted Energy Device (CED) to apprehend an individual.

[*See* WVC Manual (Mot. at Ex. 7) § 304.5.1 (emphasis added) (addressing "Conducted Energy Device")]. *See generally Negron v. City of New York*, 976 F. Supp. 2d 360, 367 (E.D.N.Y. 2013) (recognizing police policy manual should have "informed [officers'] consideration of the *Graham* factors").

"[T]he qualified immunity analysis involves more than 'a scavenger hunt for prior cases with precisely the same facts.'" *Cavanaugh*, 625 F.3d at 666. Nevertheless, the law clearly prohibited Fox's conduct in this case. The Tenth Circuit has clearly declared that an officer cannot "use his Taser on a nonviolent misdemeanant who did not pose a threat and was not resisting or evading arrest without first giving a warning." *Id.* at 667. "[T]he Fourth Amendment prohibits the use of force without legitimate justification, <u>as when a subject poses no threat or has been subdued</u>." *McCowan v. Morales*, 945 F.3d 1276, 1289 (10th Cir. 2019) (emphasis in original). Moreover, the *Graham* factors are well-established and directly "counsel[] against the use of a

large amount of force." *Casey*, 509 F.3d at 1286 (recognizing Taser "generates a charge of 50,000 volts").

Similarly, the "reasonableness" of Defendants' actions depend on the specific circumstances and risks Sivatia faced. *See Graham*, 490 U.S. at 396 ("[P]roper application requires careful attention to the facts and circumstances of each particular case . . . ."). "[T]he risk of serious injury posed by a taser is far greater and the intrusion on an individual's interests is substantially more severe if the target is in a precarious position." *Negron*, 976 F. Supp. 2d at 367-68 (collecting cases). "[T]he amount of force the use of a Taser represents changes when the Taser is used under circumstances that pose a risk of serious injury or death." *Martin v. City of Reading*, 118 F. Supp. 3d 751, 761 (E.D. Pa. 2015) (collecting cases). Indeed, as Taser itself confirms, there are many circumstances where the risks associated with a Taser are extreme:

**Secondary Injury Due to Loss of Control of Movement or Startle.** In probe deployment mode the TASER device usually renders subjects temporarily unable to control their movements. Also, a TASER device use may cause a startle response. This loss of control or startle can in some circumstances increase the risks of serious injury or death resulting from loss of balance, falls, loss of control of vehicle/machinery, or drowning. Especially at risk are persons:

- Who could fall on a sharp object (such as those holding a knife or other edged weapon)
- Who could fall and suffer impact injuries to the head or other sensitive areas
- Located on elevated or unstable platforms (*e.g.*, vehicles, trees, roofs, ladders, ledges, cranes, loading docks, and stairs)
- Who are running
- Operating a vehicle or machinery
- Located in water, mud, and or marsh environments if the ability to move is restricted
- Who are physically infirm, elderly, or pregnant

[*See Taser*, Product Warnings: Law Enforcement (Ex. K) at 3].[1]

Law enforcement has long been on notice that these additional risks must be analyzed before an offer shoots a Taser. *See, e.g.*, *Landis v. Baker*, 297 F. App'x 453, 464 (6th Cir. 2008) (recognizing "Taser manual warns against using the taser in water" and rejecting immunity);

---

1    Available    at    *https://fingfx.thomsonreuters.com/gfx/rngs/USA-TASER/0100503907S/images/warnings-2008.pdf*

*Negron*, 976 F. Supp. 2d at 368 (rejecting immunity where individual "was ten feet off the ground when [officer] pulled the taser's trigger").  For example, there are "a number of similar excessive force cases where courts have denied . . . qualified immunity based on the following fact pattern: Police tase an individual who is positioned on an elevated surface . . . causing the individual to fall." *Peroza-Benitez v. Smith*, 994 F.3d 157, 167-68 (3rd Cir. 2021) (collecting cases); *Martin*, 118 F. Supp. 3d at 763-64 (same).  Similarly, the Third Circuit distinguished a routine Taser deployment from this case.  *See Patrick v. Moorman*, 536 Fed. App'x 255, 259 (3rd Cir. 2013) ("[T]here was no risk of him falling from a significant height ***or into oncoming traffic*** or water." (emphasis added)).

Defendants ignore the past forty years of precedent and argue that *Tennessee v. Garner*, 471 U.S. 1 (1985) creates a bright line.  That is wrong.  "More recently, the [Supreme] Court has emphasized that there are no per se rules in the Fourth Amendment excessive force context . . . ." *Mattos v. Agarano*, 661 F.3d 433, 441 (9th Cir. 2011).  "[W]e must still slosh our way through the factbound morass of 'reasonableness.'"  *Scott*, 550 U.S. at 383.  In addition, the Supreme Court has rejected the idea that certain classes of claims automatically justify certain categories of force.  "The use of deadly force to prevent the escape of all felony suspects, whatever the circumstances, is constitutionally unreasonable." *Garner*, 471 U.S. at 11.  "Where the suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so."  *Reavis*, 967 F.3d at 985–86.

Fox violated Sivatia's established rights when he tased Sivatia in the middle of the highway and in response to a psychiatric call where Fox never had a weapon or threatened a third party.

**C.      Defendants could not leave Sivatia to die.**

Even if Fox's initial decision to Tase Sivatia were reasonable, Sivatia should not have been forced to lie on the highway and left for dead after he was run over.  Both the "special relationship" and the "danger creation" doctrines apply and require more from the Defendants.  Defendants' Motion entirely ignores both issues.

The special relationship doctrine provides that "when the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being." *DeShaney*, 489 U.S. at 199-200.  "[W]hen the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs—*e.g.*, food, clothing, shelter, medical care, and reasonable safety—it transgresses the substantive limits on state action set by the Eighth Amendment and the Due Process Clause." *Id.* at 200.

"A special relationship exists when the state assumes control over an individual sufficient to trigger an affirmative duty to provide protection to that individual." *Uhlrig*, 64 F.3d at 572; *accord Hunt*, 39 F.4th at 1281 (reversing dismissal of § 1983 claim based on injuries suffered while in care of foster parent).  There is no dispute that a special relationship exists here.  Defendants assumed control over Sivatia when they immobilized him with 50,000 volts and ordered him not to move.  *See Casey*, 509 F.3d at 1285 (recognizing Taser "generates a charge of 50,000 volts"); *DeShaney*, 489 U.S. at 199-200 ("[W]hen the State takes a person into its custody . . . the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being").  This special relationship both obligated Defendants to

prevent Sivatia from obvious risks and to provide him with competent medical care.  *See City of Revere*, 463 U.S. at 244-45 (establishing obligation "to provide medical care to persons . . . who have been injured while being apprehended by the police").  Officers should see that an injured suspect is "***taken promptly to a hospital*** that provide[s] the treatment necessary for [the] injury." *Id.* at 245.  [*Cf.* WVC Manual Excerpts (Ex. D) at WVC0768-69 ("Arrestees who appear to have a serious medical issue should be transported by ambulance.")].

"A state also may be liable for an individual's safety under a 'danger creation' theory if it created the danger that harmed that individual . . . ."  *Uhlrig*, 64 F.3d at 572.  "The classic case of state actors creating a danger so as to give rise to § 1983 liability is *Wood v. Ostrander*, where police officers placed plaintiff in danger by impounding her car and abandoning her in a high crime area . . . ."  *Id.* (citing *Wood v. Ostrander*, 879 F.2d 583 (9th Cir. 1989)); *see also Armijo by & through Chavez v. Wagon Mound Pub. Sch.*, 159 F.3d 1253, 1264 (10th Cir. 1998) (denying immunity after suspended special education student committed suicide).

These standards protect against an "abdication of professional responsibility sufficient to shock the conscience."  *Hunt*, 39 F.4th at 1279 (cleaned up).  "Conscience-shocking behavior evades precise definition and evolves over time."  *Id.* at 1281 (quoting *Schwartz v. Booker*, 702 F.3d 573, 586 (10th Cir. 2012); *accord Armijo*, 159 F.3d at 1262 ("We . . . left it to evolve over time.").  Behavior under this standard is "viewed in total"—"the cumulative impression of [the] conduct should be considered."  *Currier v. Doran*, 242 F.3d 905, 920 (10th Cir. 2001).  Application of the factors utilized by the Tenth Circuit is not difficult in this case:

| Factor | Application |
|---|---|
| "[Plaintiff] was a member of a limited and specifically definable group." *Armijo*, 159 F.3d at 1262. | Defendants responded to a psychological call concerning a suicidal individual. Sivatia was *the* person at issue. |
| "Defendants' conduct put Plaintiff at substantial risk of serious, immediate and proximate harm." *Id.* (cleaned up). | Defendants forced Sivatia to lie down in front of oncoming traffic in the middle of a highway. They did not block traffic. And they stood by, waiting for him to die. |
| "[T]he risk was obvious or known." *Id.* | Forcing someone to lie down on the highway with oncoming traffic is an obvious risk. The risk also was known to Defendants, who have been trained about directing and blocking traffic. Defendants' conduct also confirms their knowledge of the obvious risk. Williams parked and stood in the median instead of active traffic lanes. Fox *stood* well behind Sivatia. Even after Sivatia was fully-compliant, neither Fox nor Williams crouched to handcuff Sivatia. Neither wanted to duck down in oncoming traffic. |
| "Defendants acted recklessly in conscious disregard of that risk." *Id.* | Sivatia was tased in the middle of the highway. He was ordered to remain lying down. He was not moved, or allowed to move, to the median. Defendants did not block traffic with their vehicles. Defendants did not use proper traffic signals to stop traffic. Williams did not take any action to stop traffic from hitting Sivatia. Defendants allowed the drunk driver who ran over Sivatia to administer first aid. Then, Defendants left Sivatia for dead. |
| "[S]uch conduct, when viewed in total, is conscience shocking." *Id.* at 1262-63. | "[W]hat happened to Sivatia is undeniably tragic . . . ." [Motion (Dkt. 48) at 15]. It was preventable. Nobody should be forced to lie down on the highway and left for dead. |
| Defendants "created the danger or increased the plaintiff's vulnerability to the danger in some way." *Id.* at 1263. | Defendants are the only reason Sivatia was lying down – head forward – in oncoming traffic. Defendants also dictated the care Sivatia received (or did not receive) after his head was dislodged from the vehicle's undercarriage. |

29

When the facts and inferences are viewed in the light most favorable to Sivatia, "the cumulative impression of [the] conduct" is "truly conscience shocking."  *See Hunt*, 39 F.4th at 1281.

Indeed, this case closely parallels recent police misconduct in the State of Colorado, where police stopped a suspect, handcuffed her, and placed her in the back of the police cruiser.[2]   That cruiser, however, was not in a safe location.  Instead, it was parked on top of train tracks.  As in this case, the predictable happened: the detained suspect was hit when a train traveled exactly where a reasonable person would expect a train to travel.  The officers responsible were charged and convicted of attempted reckless manslaughter and reckless endangerment.

When viewed in Sivatia's favor, the facts of this case do not substantially distinguish it from the recent Colorado incident.  It would be an insult to justice to acknowledge that law enforcement is on notice that this type of recklessness can lead to incarceration – and yet also conclude that there is inadequate notice to impose civil repercussions.

## II.   DEFENDANTS VIOLATED SIVATIA'S RIGHTS UNDER THE UTAH CONSTITUTION.

Sivatia's claims under the Utah Constitution should not be dismissed.[3]  As demonstrated, the facts are not undisputed.  And when viewed in the light most favorable to Sivatia, the facts preclude summary judgment.  Accordingly, the Court should deny Defendants' lead and

---

2 *See, e.g.*,  https://www.9news.com/article/news/crime/colorado-train-collision-former-officer-pleads-guilty-sentenced/73-b003db3e-342e-481a-8682-fde8b16db55b#:~:text=Former%20officer%20in%20train%20collision,part%20of%20a%20plea%20deal.&text=GREELEY%2C%20Colo;          https://abcnews.go.com/US/cop-found-guilty-misdemeanors-placing-woman-patrol-car/story?id=101773339.

3 There is no dispute that the relevant constitutional provisions are self-executing and provide a direct cause of action. *See, e.g.*, *Spackman v. Bd. of Educ. of Box Elder Cnty. School. Dist.*, 2000 UT 87, ¶¶ 9-10, 16 P.3d 533 (recognizing unnecessary rigor and due process clauses are self-executing); *Jensen v. Cunningham*, 2011 UT 17, ¶ 59, 250 P.3d 465 ("article I, sections 1, 7, and 14[] are self-executing.").

overarching argument that none of Sivatia's state "claims can withstand scrutiny based on the undisputed facts." [*See* Motion (Dkt. 48) at 10]. The Court similarly should reject Defendants' legal arguments.

"In addition to the differences in constitutional language and interpretive case law, the framework for making out a claim for damages for a violation of one's constitutional rights is different under state and federal law." *Jensen v. Cunningham*, 2011 UT 17, ¶ 47, 250 P.3d 465. For example, the Utah Constitution does not require "clear precedent on point that specifically recognizes the claimed right and applies it to analogous facts." *Id.* at ¶ 67. "Because the state and federal standards for determining whether a plaintiff is entitled to damages for a constitutional violation are different, a federal court determination that the material undisputed facts do not give rise to a federal constitutional violation does not preclude . . . deciding whether those same facts will give rise to a state constitutional violation." *Id.* at ¶ 49.

Similarly, while the Utah Supreme Court has recognized the Court should not turn to constitutional claims unless "existing remedies do not redress his or her injuries," that statement was focused on existing claims under Utah law. *See Spackman v. Bd. of Educ. of Box Elder Cnty. Sch. Dist.*, 2000 UT 87, ¶ 24, 16 P.3d 533. The Utah Supreme Court expressly has not "reach[ed] the question of whether existing federal law remedies should preclude . . . damages for a state constitutional tort." *Id.* at ¶ 24 n.10. Indeed, the Utah Supreme Court gives deference to existing claims "out of respect for separation of powers' principles." *Id.* at ¶ 24. The Utah Constitution endows the Utah Legislature with "the authority . . . to establish appropriate remedies for individual injuries." *Id.* The same cannot be said of the United States Congress, which owes no duty under the Utah Constitution. Regardless, the Utah Supreme Court has been clear that

31

resolving federal constitutional questions does end the analysis of the Utah Constitution.  *See Jensen*, 2011 UT 17, ¶ 49.  Yet, that is the outcome that Defendants seek.  *But see Finlinson v. Millard Cnty.*, 455 F. Supp. 3d 1232, 1245 (D. Utah 2020) ("Because it is possible that a jury could allow [plaintiff] to recover under his state constitution claim while still denying his federal claim, it would be premature to hold that [plaintiff] has an existing remedy . . . that bars his state claim.").

### A.   Article I, Section 9 – Unnecessary Rigor.

Utah's Constitution is clear: "Persons arrested or imprisoned shall not be treated with unnecessary rigor."  UTAH CONST. art. I, § 9.  That protection is unique.  "Although the first sentence of article I, section 9 closely approximates the language of the Eighth Amendment . . ., the unnecessary rigor provision **has no federal counterpart**."  *Dexter v. Bosko*, 2008 UT 29, ¶ 7, 184 P.3d 592.[4]  Indeed, similar provisions "exist in only four other state constitutions."  *Id.*  "The unnecessary rigor clause of the Utah Constitution protects persons arrested or imprisoned . . . ."  *Id.* at ¶ 17.  "Although police may use 'reasonable and necessary force' in making an arrest, the prohibition against unnecessary rigor does not allow police officers to commit assault and battery on a criminal suspect."  *Id.* at ¶ 16 (cleaned up).  Nor does it allow them to disregard a suspect's medical needs.  *See Bott v. DeLand*, 922 P.2d 732, 740 (Utah 1996) ("Likewise, prison guards would be liable for intentionally denying or delaying access to medication or medical treatment."). "[A]rticle I, section 9 provides a basis for an award of monetary damages if a prisoner proves that a prison employee was deliberately indifferent to his medical needs or subjected him to clearly excessive or deficient and unjustified treatment."  *Id.* at 744.

---

4 Defendants' reliance on Eighth Amendment cases, analysis, and claims are therefore inapplicable.  [*See* Motion (Dkt. 48) at 12, 16].  The Eighth Amendment is not a counterpart to the unnecessary rigor provisions of the Utah Constitution.

"The term 'rigor' is defined as 'an act or instance of strictness, severity, harshness, oppression, or cruelty.'" *Dexter*, 2008 UT 29, ¶ 12. "Such a meaning applies well in this context." *Id*. "This may include being unnecessarily ***exposed to an increased risk of serious harm***." *Id.* at ¶ 19 (emphasis added). *See generally id.* at ¶ 33 (majority concurrence) ("[T]he shifting tides of penal philosophy will affect the necessity of certain forms of rigor."). Importantly, resolution of this claim presents a question of fact. "***The finder of fact*** must first determine whether the risk of harm was serious, and whether that risk was obvious and known to the defendants. *Id.* at ¶ 26 (emphasis added). "If so, ***the finder of fact*** must then address what, if any, justification existed for the act, as well as the reasonableness of that justification." *Id.* (emphasis added).

In *Dexter v. Bosko*, 2008 UT 29, 184 P.3d 592, "[t]he plaintiff's claims ar[o]se from injuries suffered in a vehicle accident." *Id.* at ¶ 1. The plaintiff, "who [was] handcuffed and shackled, [was] unable to buckle [his] own seatbelt[]." *Id.* at ¶ 3. The vehicle crashed, and the plaintiff "died five years later due to complications." *Id.* The plaintiff argued that the "failure to place him in a seatbelt violated his rights under article I, section 9 of the Utah Constitution." *Id.* at ¶ 4. The Utah Supreme Court refused to dismiss the plaintiff's claims, instead finding that the claims should proceed to trial. *See id.* at ¶ 26 ("The finder of fact must first determine . . . .").

In *Bott v. DeLand*, 922 P.2d 732 (Utah 1996), the plaintiff reported "blurred vision in his right eye" after "almost two years of incarceration." *Id.* at 734. The defendant "determined that his condition was not serious, and placed him on a waiting list to see an optometrist." *Id.* However, the condition was serious and plaintiff became "dependent upon hemodialysis three times each week, and his life expectancy had allegedly greatly diminished." *Id.* at 735. A jury ruled in the plaintiff's favor on his excessive rigor claim. The Utah Supreme Court affirmed that award after

ruling no damages cap could apply. *See id.* at 744 (remanding to "enter amended judgments against defendants on plaintiff's constitutional claim without regard to the statutory cap on damages").

When all of the facts and inferences are viewed in Sivatia's favor, a "finder of fact" could determine that "the risk of harm was serious" and was "obvious and known to the defendants." *Dexter*, 2008 UT 29, ¶ 26. That same factfinder "must . . . address what, if any, justification existed for the act, as well as the reasonableness." *Id.* In short, summary judgment is improper.

**B.      Article I, Section 7 – Due Process.**

Defendants provide no analysis of Sivatia's claim under article I, section 7 of the Utah Constitution. Instead, Defendants' sole argument is that "Plaintiffs again fail cannot [sic] demonstrate that their Section 9 or Section 7 claim is compensable due to the availability of existing federal remedies." [Motion (Dkt. 48) at 16]. Again, that conclusory argument fails.

First, Sivatia incorporates the authority cited above. As recognized, "[i]n addition to the differences in constitutional language and interpretive case law, the framework for making out a claim for damages for a violation of one's constitutional rights is different under state and federal law." *Jensen*, 2011 UT 17, ¶¶ 47-48. "Because the state and federal standards for determining whether a plaintiff is entitled to damages for a constitutional violation are different, a federal court determination that the material undisputed facts do not give rise to a federal constitutional violation does not preclude . . . deciding whether those same facts will give rise to a state constitutional violation." *Id.* at ¶ 49; *Finlinson*, 455 F. Supp. 3d at 1245 ("Because it is possible that a jury could allow [plaintiff] to recover under his state constitution claim while still denying his federal claim, it would be premature to hold that [plaintiff] has an existing remedy . . . that bars his state claim.").

In addition, the Utah Supreme Court has never ruled that "existing federal law remedies should preclude . . . damages for a state constitutional tort." *Spackman*, 2000 UT 87, ¶ 24 n.10.

Second, Defendants ignore the differing constitutional provisions at issue. "[Sivatia] ha[s] alleged state constitutional claims for violation of due process and unnecessary rigor." *Blackmore v. Carlson*, 574 F. Supp. 3d 1012, 1053 (D. Utah 2021). "Neither of these claims mirror [Sivatia's] federal claims." *Id.* "The Utah Supreme Court has explained that state due process claims differ from federal due process claims . . . ." (citing *Jensen*, 2011 UT 17, ¶ 46).

The Court should ignore Defendants' invitation to automatically dismiss claims made pursuant to Article I, Section 7 of the Utah Constitution merely because of the "availability of existing federal remedies." [Motion (Dkt. 48) at 16].

## III.   WEST VALLEY HAS NOT ESTABLISHED ADEQUATE POLICIES OR COMPLIANCE.

### A.   West Valley Did Not and Cannot Support its Arguments.

West Valley argues (1) "the undisputed facts demonstrate that West Valley has adopted policies and procedures" and (2) "West Valley provided Taser training to Officer Fox." [Motion (Dkt. 48) at 17-18]. However, ***none*** of Defendants' 16 Statements of Fact address these issues. [*See id.* at 3-5]. This alone is reason to deny West Valley's argument. "A party asserting that a fact cannot be . . . genuinely disputed must" support that assertion. Fed. R. Civ. P. 56(c)(1); DUCiv R. 56-1(b)(3). West Valley cannot sandbag. It cannot argue that Sivatia failed to dispute alleged statements of "fact" that West Valley did not properly articulate or support.

Even if Sivatia has the burden of disputing statements of "fact" that West Valley did not explicitly assert or support, West Valley's arguments still fail.

First, the ***only*** support for West Valley's argument that it "has adopted policies and procedure" is the "Policy Manual, attached as Exhibit 7." [*See* Motion at 17-18; Dkt. 48-5]. However, the policy manual in Exhibit 7 is dated "***9/13/2022***" – two years after Defendants caused Sivatia to be crushed by a car. [*See* Dkt. 48-5 (emphasis added)]. Notably, Sivatia has formally requested any other applicable policy manuals. [*See, e.g.*, Disc. Requests (Ex. H) at RFP 4 ("documents . . . relating to training and/or protocol relating to the Incident"); *id.* at RFP 5 ("All WVC training materials . . . ."); *id.* at RFP 10 ("policies Defendants contend apply to the Incident")]. Yet the only complete policy manual Defendants produced is the manual dated ***two years*** too late. [*See* Dkt. 48-5]. Defendants' discovery responses should be binding, particularly when Defendants file for summary judgment.

Second, Defendants' citation to training rosters demonstrates the inadequate nature of West Valley's alleged training protocols. Indeed, West Valley's Exhibit 7 declares that "[p]roficiency training for personnel who have been issued [a Taser] should occur ***every year***." [*See* Dkt. 48-5 at § 304.9]. In addition, "[p]eriodic audits should be used for verification." [*Id.*]. Defendants did not meet those clear standards. Fox has worked at West Valley for at least 14 years. [*See* Fox Letter (Ex. M) (discussing Fox's West Valley police activity in December 2010)]. As part of this case, Defendants were asked to produce "training materials related to officer use of tasers . . . in the 10 years preceding or since the Incident." [Disc. Requests (Ex. H) at RFP 5]. Despite that extended history, the only training logs identified in Defendants' Motion are dated 2022 and 2019 – three years apart. [*See* Dkt. 48-6]. Indeed, Defendants' Exhibit 8 confirms that Fox ***was not*** in compliance with West Valley's policies on December 6, 2020 – the night at issue. Instead, Fox's most recent prior Taser training was "10/21/19," more than twelve months earlier. [*Id.* at

WVC_0157].  "Only members who have successfully completed department-approved training may be issued and carry the [Taser]."  [Dkt. 48-5 at § 304.3].  Yet West Valley allowed Fox to carry a Taser and shoot Sivatia in the middle of the highway.

### B.    West Valley Has a Documented History of Disregarding its "Policies."

It is not enough for a law enforcement department to have a written policy manual.  Instead, that manual must actually be enforceable and enforced.  If the written policies are disregarded by the officers and department, they likewise should be disregarded by the Court.  So it is here.

As noted, West Valley has not presented a controlling manual from 2020.  Nor has it established adequate training in 2020.  Even setting those issues aside, this case demonstrates multiple, express violations of West Valley's alleged protocols.  This case also confirms that West Valley has not enforced the same protocols it now asks the Court to utilize as a shield.  The following are but a few examples:

| WV Manual | Reality[5] |
|---|---|
| "Officers shall document all [Taser] discharges in the related arrest/crime report and the [Taser] report form." <br> [WVC0493 at § 304.6]. | Fox did ***not*** submit a report or statement.  [*See* Dkt. 48-2]. <br> Fox did ***not*** prepare or produce a Taser report.  [*See id.*]. |
| "Items that shall be included in the [Taser] report form are . . . ." <br> [*Id.* at § 304.6.1]. | Fox did ***not*** prepare or produce a Taser report.  [*See id.*]. |
| "The Training Unit Sergeant should also conduct audits of data downloads and reconcile [Taser] report forms with recorded activations." <br> [*Id.*]. | None were prepared or produced.  [*See id.*]. |
| "The device's onboard memory should be downloaded through the data port by a | |

---

5 Sivatia also served written discovery requesting, among other items, "[a]ll documents . . . referring or relating to the Incident."  [Disc. Requests (Ex. H) at RFP 2].  This column reflects the documents Defendants produced.

| | |
|---|---|
| supervisor or Training Unit Sergeant and saved with the related arrest/crime report. Photographs of probe sites should be taken and witnesses interviewed." [*Id.* at § 304.8]. | The device's onboard memory has not been produced and was not included with the incident report. [*See id.*]. |
| "When an officer points a . . . taser at an individual, the officer shall report the incident . . ." including by providing "[a] description of the incident" and "the individuals involved." [*Id.* at § 300.5.1]. | Fox did ***not*** submit a report or statement. [*See id.*]. |
| "The IRC [Incident Review Committee] shall convene to review all Officer Involved Critical Incidents . . . ." [*Id.* at § 301.3]. | Defendants did not produce any records related to the IRC. [Pate Dec. (Ex. I) ¶ 7]. |

None of the Defendants were reprimanded or punished for Sivatia's injury or their multiple violations of West Valley's policy manual. [*See* Additional SOF ¶ 31]. Accordingly, a reasonable jury could conclude that West Valley has, either formally or informally, authorized this conduct. *See generally Monell v. Dep't of Soc. Servs. of New York*, 436 U.S. 658 (1978).

## IV.   Declaratory Judgment.

Finally, Defendants misunderstand Sivatia's claim for declaratory judgment and applicable law. Defendants assume (improperly) that if qualified immunity applies, there can be no claim for declaratory relief. Not so.

However, as Defendants concede, if qualified immunity does not apply, Sivatia's claim for declaratory relief establishing that Defendants violated his constitutional rights (i.e., retrospective relief) remains. And as argued above, qualified immunity does not apply.

But even if qualified immunity did apply (it does not), Sivatia's claim for declaratory relief remains. "Qualified immunity is only an immunity from a suit for damages, ***and does not provide immunity from suit for declaratory or injunctive relief.***" *Auvaa v. City of Taylorsville*, 506 F.

Supp. 2d 903, 913 (D. Utah 2007); *see also Eagon Through Eagon v. City of Elk City, Okl.*, 72

F.3d 1480 (10th Cir. 1996); *Los Angeles Police Protective League v. Gates*, 995 F.2d 1469, 1472

(9th Cir. 1993) ("Qualified immunity . . . does not bar actions for declaratory or injunctive relief.");

*Rowley v. McMillan*, 502 F.2d 1326, 1331 (4th Cir. 1974) (same); *Allen v. Coughlin*, 64 F.3d 77,

81 (2nd Cir. 1995) ("Even if established . . ., qualified immunity is not grounds for dismissing

[claims for declaratory and injunctive relief].").

"Qualified immunity thus cannot bar the plaintiffs' claims for declaratory and injunctive

relief." *Auvaa*, 506 F. Supp. 2d at 913.

In *Eagon,* the plaintiff sued governmental officials based on their refusal to allow it to

display a nativity sign. *Id.* at 1483. The defendants conceded that they had prevented the plaintiff

from displaying its sign, stating that the sign was "partisan in nature." *Id.* The plaintiff brought

"suit under 42 U.S.C. § 1983, alleging that defendants violated their rights of free speech and equal

protection under the First and Fourteenth Amendments" and also sought "injunctive and

declaratory relief, damages, and attorney fees." *Id.* The district court granted summary judgment

in favor of the plaintiffs, "but held that the individual defendants were entitled to qualified

immunity from damages in their individual capacities." *Id.* at 1484. On appeal, the Tenth Circuit

affirmed the grant of a declaratory judgment, holding that the defendants had violated the

plaintiff's constitutional rights and also upheld the application of qualified immunity. *Id.* at 1490-

91.

The same result would apply here. While Defendants are not entitled to qualified

immunity, even if they were, that does not serve as a bar to Sivatia's claim for declaratory relief,

which seeks retrospective relief in the form of a ruling that Defendants' prior conduct violated Sivatia's constitutional rights.

Defendants' reliance on *ACLU of Massachusetts v. U.S. Conf. of Cath. Bishops*, 705 F.3d 44 (1st Cir. 2013) and *Winsness v. Yocom*, 433 F.3d 727 (10th Cir. 2006) is misguided, as both cases are easily distinguishable.  In *ACLU of Massachusetts*, the First Circuit found that plaintiff's claim, asking the court to declare a governmental partnership with a religious entity to be in violation of the Establishment Clause, moot because the partnership had ceased.  705 F.3d at 57-58.  Notably, the plaintiff was not seeking a declaration that its constitutional rights had been violated.

*Winsness* addressed only prospective relief.  In *Winsness*, the plaintiff "abandoned any claim for money damages, including nominal damages," and sought a declaration that a statute interfered with his constitutional rights.  433 F.3d at 735.  The Tenth Circuit recognized that such relief "would operate prospectively."  *Id.*

Thus, Defendants recognize that dismissal of Sivatia's seventh claim is possible only "to the extent that [Sivatia] seek[s] declaratory relief that is separate from [his] federal constitutional claims."  [Motion (Dkt. 48) at 20].  Sivatia's claim, however, seeks a declaration that Defendants actions violated his constitutional rights.  [Third Am. Comp. (Dkt. 31) at ¶ 245].  Thus, summary judgment on Sivatia's Seventh Cause of Action is improper and Defendants' Motion should be denied regardless of whether qualified immunity applies.

## CONCLUSION

For the foregoing reasons, Defendants' Motion should be denied.

DATED this 16th day of January, 2024.

JAMES DODGE RUSSELL & STEPHENS, P.C.

/s/ Mitchell A. Stephens
Mitchell A. Stephens
Justin L. James

*Attorneys for Plaintiffs*

41